146 So. 265

**BIRMINGHAM BELT R. CO. v. BENNETT.**

6 Div. 84.

Supreme Court of Alabama.

Oct. 6, 1932.

Rehearing Denied March 2, 1933.

---

[1] 225 Ala. 613

Cabaniss & Johnston and L. D. Gardner, Jr., all of Birmingham, for appellant.

W. O. Dalrymple and Hugo L. Black, both of Birmingham, for appellee.

KNIGHT, J.

This action was brought by Mrs. Eileen Bennett, as administratrix of the estate of George Bennett, deceased, under the Federal Employers' Liability Act (45 USCA §§ 51–59) for the death of the said George Bennett.

The defendant, in the action, the Birmingham Belt Railroad Company, at the time the plaintiff's intestate received his fatal injuries, was engaged in interstate commerce, and the said Bennett was an employee of the defendant, and, as such, was engaged in placing a box car, which was moving in interstate commerce over defendant's line of railway, on one of its side tracks. This car was shipped from Niagara Falls, N. Y., consigned to the Birmingham Paper Company, at Birmingham, Ala., and the defendant was the delivering carrier of this shipment. Upon the trial of the cause, the defendant admitted that the car in question came from Niagara Falls, N. Y., consigned to the Birmingham Paper Company, and that the defendant was engaged in interstate and intrastate commerce.

It is quite certain from the pleadings and proof that, at the time the plaintiff's intestate received his fatal injuries, the defendant was

a common carrier, engaged in interstate commerce, and that plaintiff's intestate was actually engaged in the performance of his duties as a railroad switchman for defendant in and about its said interstate business.

The Birmingham Belt Railroad Company maintained a line of railway in Birmingham, Ala., on the 30th day of December, 1930, and on that day had a spur track along Avenue E in said city, between Twenty-First and Twenty-Second streets. This spur track ran along the north side of the concrete platform of the Birmingham Paper Company's plant, and, in making deliveries of shipment to said paper company, the defendant used its said spur track. A switching crew employed by defendant regularly placed cars of freight consigned to the Birmingham Paper Company alongside this platform. This platform is the property of the paper company. Among other purposes, this platform was used at the time for loading and unloading freight shipments. The length of this spur track is approximately three hundred and thirty-eight feet. After leaving the main line, this spur track curves to the south, until it comes in line with the above-mentioned platform, and then it runs along the north side of the platform to the end of the same. Near the east end of the platform there was, and had been for a long while, a clearance warning signal, reading, "Clearance warning, these buildings will not clear a man on side of cars."

From a point approximately ten to twelve feet east of the concrete steps to the platform westward, this spur track is so close to the platform that there is not sufficient clearance for a switchman to stand between the platform and a moving engine and tender, equipped with rerailers attached to sides of tender. But from the same point twelve or fifteen feet east of the concrete steps, eastward, a man standing between the platform and a moving engine and tender, equipped with rerailers, would be at all times in the clear.

It appears without dispute that for a number of years next before the date of the accident plaintiff's intestate had been employed by the defendant as a switchman, and he was an experienced hand at the business. Theretofore this man had been employed by other railroad companies in the same line of work. The testimony shows that the deceased had worked for quite a while in switching cars on this same side track.

The engine was what is known as the No. 1200 type—a large engine—and attached to the sides of the tender were rerailers; and these rerailers extended out about three inches on each side of the tender, thus giving an additional width to the tender of about three inches on each side. The deceased was familiar with the location of the grounds, track, and platform, as he had been constantly engaged in that particular business for quite a while. On the 30th day of December, 1930, the crew, of which the deceased was a member, were directed to place this car from Niagara Falls on the spur track along the platform of the Birmingham Paper Company, for unloading purposes. The deceased was working on the night shift, and about 4:10 a. m. the engineer, with the deceased and one Reeser, who was the foreman of the switching crew, undertook to place the car near the west end of the paper company's plant. It was then dark. The engine, with tender and car attached, backed down this spur track, and, while backing along the spur track, going westward, the deceased was riding on the west end of the box car, and the foreman of the switching crew was on the east end. Both Bennett and the foreman had lanterns, and both were on the south side of the car, which was the side the engineer was on. The foreman testified on direct examination in part as follows: "Mr. Bennett got off from the opposite end of the car from me and got on the ground. It was dark. I could not tell exactly where he had gotten off with reference to that platform. He stayed on the ground there as I went by him on the car. I had a lantern. I could signal the engineer to start or stop, or anything I wanted, and he would have to obey whatever signals I gave him. As I passed Bennett, I was looking toward 21st Street to spot the car. I did not know, or have any reason to think, he wasn't in the clear until after I heard him holler."

Further on, this witness testified: "I knew he was where he was, but did not know how close he was. I knew it was a dangerous place because we had been talking about it up at 32nd Street. I knew the further it went the tighter it got. I knew if anything hit him it was liable to knock him down and kill him. * * * I knew if I gave a signal the engineer would stop. I went on by and never gave a signal until he hollered. I saw him just before I went by him. I saw him when he dropped off. His lantern was in his hand, but I don't know whether it was down by his side, or up high, or down low. I could not tell. * * * As I went by I was about my length from him. My head was about my length above him. Yes, he was in the performance of his duties. He flagged the crossing."

Byrd, the engineer, while on the stand, testified: "We were backing in there very slow, about like a man would walk; maybe two miles an hour, and maybe not so much, expecting to get the stop signal at any time. It was dark. It was customary for the man to get off somewhere east of those steps. There is no designated point. There is a point in there when the men are perfectly safe. * * * Then, when Bennett, who was riding on the front end got off, he was about sixty feet from me. That was about 4:10 in the morning and dark. Bennett had a lantern. If he had wanted me to stop, he would have

given a stop signal, which is given across the track. If he had given this signal, I would have stopped and could have stopped in two feet. I did not know prior to the time Bennett cried out and hollered that he had gotten off at a place where he wasn't clear between the engine and the side of the wall. Until Bennett hollered out, I did not know that he was in a place that the engine would not clear him—the engine, or the tender, either one, or the car. I did not know prior to the time Mr. Bennett cried out or hollered that he was in a position where the engine or tender wouldn't clear him where he was standing. I had been on that night shift several months. I don't remember just how long. It was the usual and customary practice for the switchman going in there to get off along about the point where Bennett got off that night. It was customary for them to get off along about where he did and then stand there until the car was spotted and then cut loose."

On cross-examination this witness testified: "I would say Mr. Bennett was about twelve feet east of the concrete steps when I saw him on the ground. When he got down I don't know just what his clearance was. It was dark and I couldn't see anything. I knew about where he was. I am not familiar with the clearance enough to know just where he got off. I saw him step off the westerly end of the moving car and stand between it and the platform. * * * I knew he was over on the side where he didn't have any way to climb to the top. I saw him get off and I saw him at a point ten or twelve feet east of the concrete steps. I saw his light where he got off. When he got off he was about sixty feet from me. I knew where he was and knew he couldn't get up on top. I had been traveling over there some time and I knew that there was a pipe there that projected out from the side of the wall. I knew that pipe projected out about one foot, and I knew that ten or twelve feet was between the pipe and the concrete steps. I saw him at the point he got off and knew at the. time I could stop that car within two or three feet. I did not know that the engine was wider than the car. I was not positive that the place, where the rerailing frogs were hanging down was wider than the car until we backed west of the steps. * * * I knew that if we kept on going down there with that engine that ultimately this rerailing frog would come down to where he was and I could have stopped in two feet. I didn't stop until I heard him holler. It is my duty to try to ascertain whether or not a man is in a place of danger and it is my duty to stop if I see him in danger. * * * That is the only time I ever remember going west of the steps with a large engine."

This witness further testified that he found out later how many feet Bennett was east of the concrete steps, but that at the time he was in there he did not know how many feet he was east of the steps; that it was customary for them to get off along about where he did and then stand there until the car was spotted and then cut loose. However, on recross-examination the witness testified: "I don't know what distance from the steps it will clear, but it was customary for them to get off to clear. I don't know just what the distance is from the steps where it will clear, but my best judgment is twelve or fifteen feet east of the steps."

And on redirect-examination he testified: "In other words, it is my judgment that a man standing twelve or fifteen feet east of the concrete steps would clear."

The duties of the deceased at this particular time were to see that the track was clear and to cut cars loose when stopped at the place they were to be left along the side track.

The complaint, as originally filed, contained two counts. The first count averred that the injuries and death of the said George Bennett were the proximate result of the negligence of the defendant's servant or servants, in the operation of the engine, while acting within the line and scope of his or their duty and authority as such servant or servants. The second count ascribes the injury and death of plaintiff's intestate to the negligence of the defendant in failing to promulgate and enforce reasonable rules for the regulation of the work in which plaintiff's intestate was engaged, by providing a proper system of warnings, signals, and watchouts. Thereafter, the plaintiff, as the record discloses, filed an amendment to her complaint by adding count 3, and in this added count plaintiff based her action against the defendant upon the negligence of the defendant, its servant or servants, agent or agents, in allowing the track to be and remain so close to a concrete platform that plaintiff's intestate did not have a reasonably safe place in which to discharge the duties required of him. This amendment was filed on November 5, 1931. No order is shown by the minute entry allowing the amendment. On the same day that the amendment was filed, the defendant filed its pleas to the complaint, and to each count thereof, separately and severally.

Upon the trial of the cause, the plaintiff by leave of the court withdrew count 2, and this is shown in the minute entry. We will have occasion to refer to this count in a subsequent part of this opinion.

There was a verdict in favor of the plaintiff, assessing her damages at $15,167, and from a judgment thereon the present appeal is prosecuted by the defendant.

■ Upon the conclusion of the evidence, the defendant requested, in writing, the general affirmative charge in its behalf. The question presented for our determination thereby is whether the plaintiff, by the evidence, has carried the burden of proof cast

upon her to the point where it became the duty of the court to submit the issues to the jury. In determining this question, it must be borne in mind that the "scintilla rule" applying in Alabama does not apply in proceedings brought under the Federal Employers' Liability Act (45 USCA §§ 51–59). Under the decisions of the federal courts, the matter of the burden of proof is regarded as of the substance of the right created by the federal act, and is without the category of "practice and procedure," which is subject always to the law of the forum. And whether a plaintiff, suing under the federal act, has made out a case by the evidence entitling the issue to be carried to the jury, must be determined by reference to the federal rule and not under the "scintilla rule" which obtains in Alabama.

The Supreme Court of the United States, in the case of Commissioners of Marion County v. Clark, 94 U. S. 278, 284, 24 L. Ed. 59, holds:

"Judges are no longer required to submit a case to the jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury to proceed in finding a verdict in favor of the party introducing such evidence. Ryder v. Wombwell, Law Rep. 4 Exch. 39.

"Decided cases may be found where it is held that, if there is a scintilla of evidence in support of a case, the judge is bound to leave it to the jury; but the modern decisions have established a more reasonable rule; to wit, that, before the evidence is left to the jury, there is or may be in every case a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the burden of proof is imposed."

This rule was recognized and given effect in the later cases, by the same court, of Bowditch v. Boston, 101 U. S. 16, 18, 25 L. Ed. 980, and Yazoo & M. V. R. R. Co. v. Mullins, 249 U. S. 531, 39 S. Ct. 368, 63 L. Ed. 754. Our own court in the cases of Louisville & Nashville R. R. Co. v. Hall, 223 Ala. 338, 135 So. 466, and Louisville & Nashville R. R. Co. v. Parker, 223 Ala. 626, 138 So. 231, has followed this rule in cases arising under the federal act.

 We have carefully read and considered all the evidence in this case, tending to establish negligence against the defendant's engineer and the foreman of the switching crew, Mr. Reeser. There is absolutely no escape from the conclusion that the plaintiff's intestate was in a place of exceeding danger, when he alighted from the backing box car. At the point where he alighted, to his back, was a high concrete wall; and moving along just in front of him, in close proximity, was, first, a box car, then the tender to the engine, made wider by the attached rerailers. Both the foreman of the switching crew and the engineer could and did see the deceased at the time he alighted, and took his stand between the moving cars and the wall. The plaintiff's engineer testified that in his judgment the distance from the steps where a man would be in the clear was twelve to fifteen feet east of the steps. In another place, this engineer testified that Mr. Bennett was about twelve feet east of the concrete steps when he saw him on the ground.

The engineer while testifying in terms that he did not know that the engine was wider than the car, yet the evidence shows that the entire car and a part of the tender passed Bennett without injuring him. An actual measurement showed that the distance between the tender and wall at the place where the injury occurred was approximately twelve inches, and the distance between the rerailers and the wall at the same point was approximately six inches. It was for the jury to say whether or not the engineer was ignorant of this fact, notwithstanding his testimony to the contrary.

The engineer saw the plaintiff's intestate at a point about ten or twelve feet east of the steps. The engineer knew that, if the plaintiff's intestate was nearer to the concrete steps than twelve feet, he was in a place of peril. The engineer knew that he was operating a large engine, and he testified that on the occasion of the injury he could not remember ever to have gone west of the steps with a large engine. When last seen by the engineer, before the injury occurred, the deceased, according to the engineer's testimony, was on the ground, with lantern in hand, with his back to a high concrete wall. The testimony tends to show that the deceased could neither scale this wall nor climb upon the car. The engineer testified that it was his duty "to try to ascertain whether or not a man was in danger, and that it was his duty to stop if he should see him in danger." He further testified: "That is the only time that I ever remember going west of the steps with a large engine." It must be borne in mind that it was dark, and lanterns were used both by the deceased and by Reeser, the foreman.

The plaintiff introduced in evidence the answers of defendant to interrogatories propounded by her to it. Interrogatory 23 (a) was: "State at what point between the track and the Birmingham Paper Company's platform George Bennett, deceased, got off the car on which he was riding, immediately prior to the time he was injured on, to-wit, December 30th, 1930?" This question was answered: (a) At a point ten or twelve feet east of the concrete steps. If he got off and was standing ten feet east of the steps, under the tendency of the testimony he was not in the clear.

Under the conditions then prevailing, it was open to the jury to find that the engineer knew that the deceased was in a place of per-

il, and the very circumstances of the case called for care and caution, both on the part of Byrd, the engineer, and of Reeser, the foreman, to conserve the safety of a human life, then confessedly in a position of peril. The evidence affords an inference that the deceased came to his death by being crushed between the rerailer and the concrete wall, for it is certain that the car cleared him in passing and also a part of the tender.

There are a number of photographs in the record, which show the plant of the Birmingham Paper Company, the concrete platform, the steps, the iron pipe, and also the defendant's spur track, locomotive, and the clearance warning sign.

Upon a consideration of all the testimony in the case, we are at the conclusion that the case made by the evidence called for its submission to the jury, upon the question of negligence of the defendant's servant or servants, engaged in and about the movement of defendant's engine and car at the time plaintiff's intestate received his fatal injuries, and also upon the question of contributory negligence, vel non, and the extent thereof, of plaintiff's intestate, as well as upon the questions presented by defendant's plea of assumption of risk.

■■ An employee must be held to have assumed the ordinary risks of his employment; and, when obvious, or fully known and appreciated, he must be held to have assumed the extraordinary risks and those due to negligence of his employer and fellow employees. Delaware, Lackawanna & Western R. R. Co. v. Koske, 279 U. S. 7, 49 S. Ct. 202, 73 L. Ed. 578. Under the evidence in this case, it was a question for the jury to determine whether the plaintiff's intestate must be held to have assumed the risk due to the negligence, if any, of his fellow employees. The defendant was not, therefore, entitled to the general affirmative charge in its behalf. L. & N. R. R. Co. v. Parker, 223 Ala. 626, 138 So. 231.

■ The plaintiff upon the trial of the cause withdrew count 2. The court nowhere in its oral charge makes mention of that fact. The defendant requested the court in writing to give this charge to the jury: "4. If you believe the evidence, your verdict cannot be for plaintiff under count two of the complaint."

In the case of Scott v. Louisville & Nashville R. R. Co., 217 Ala. 255, 115 So. 171, 172, on rehearing, the court had under consideration two charges requested by the plaintiff, one of them being in the following language: "(7) The court charges the jury that the contributory negligence of Mr. Scott, the driver of the automobile, cannot be considered by the jury in determining the liability of the defendant." The other charge dealt with same question. The complaint in the Scott Case, supra, contained two counts, one for simple negligence and the other for a wanton wrong. The count withdrawn was the simple negligence count. Upon rehearing the court held that, inasmuch as evidence tending to establish the plea of contributory negligence, filed by defendant to count charging simple negligence, had been properly introduced while this count and plea were in the case, it was error on the part of the court, and probably prejudicial to plaintiff, in refusing charges 7 and 8.

However, the case now before the court does not come within the rule declared by us in the Scott Case, and, furthermore, the court in its oral charge narrowed the issue of negligence to that of the engineer and foreman. The court, therefore, committed no error in refusing defendant's requested charge four.

■ We come now to a consideration of count 3. In brief of counsel for appellee, we find the following statement with reference to this count: "The minute entry fails to make reference to count three, and since count three does not appear in the minute entry the court cannot consider it." And in brief of appellant we find the following: "The record shows that on the day the trial was commenced, the complaint was amended by filing count three, but the minute entry fails to make any reference whatsoever to count three. Under these circumstances we think it will be presumed that count three was withdrawn by the plaintiff. Nevertheless it appears in the record that count three was filed, was a part of the papers in the case, and presumably was taken by the jury to the jury room and considered along with the other papers." Of course, whether this count was ever delivered to the jury or taken out and considered by them is merely conjectural.

Inasmuch as both appellant and appellee are in accord to the point that count 3 was not a count of the complaint in the case when it was submitted to the jury, we acquiesce for the purpose of the case, in their assertions and their common understanding as to the status of the count. This then, reduces our consideration on the phase of the case intended to be presented by count 3 to the one question, and that is, Did the court commit error in refusing to charge the jury in the language of defendant's requested charge A? Charge A was as follows: "If you believe the evidence, your verdict cannot be for plaintiff under count three of the complaint."

In support of their contention that this charge should have been given, we are referred to the cases of Scott v. Louisville & Nashville R. R. Co., 217 Ala. 255, 115 So. 171, and St. Louis, etc., R. Co. v. Lane, 156 Ark. 465, 246 S. W. 494.

The situation presented in the Scott Case was entirely different from that presented in this case. And we have heretofore held that ordinarily, when a count is withdrawn before the jury retires, the court will not be put in

error for a refusal to instruct the jury under the withdrawn count. Wright, etc., Contracting Co. et al. v. Ala. Fuel & Iron Co., 211 Ala. 89, 99 So. 728; American Ry. Ex. Co. v. Compton, 205 Ala. 298, 300, 87 So. 810; W. U. Tel. Co. v. Boteler, 183 Ala. 457, 465, 62 So. 821; L. & N. R. R. Co. v. Hubbard, 148 Ala. 45, 41 So. 814.

Charge A was abstract, and there was no error committed by the court in its refusal. It also appears from the court's oral charge that the plaintiff's right to recover was confined to count 1, and also that count 3 was in legal effect charged out by charges 15 and 16, given at the request of defendant.

Defendant, by its eighth assignment of error, presents for review the propriety of the court's action in refusing its written instruction 9. The defendant was not entitled to have the jury so instructed. The charge was but an attempt to defeat the action by reason of contributory negligence on the part of the plaintiff's intestate. While the contributory negligence of the plaintiff's intestate may be shown, and considered by the jury in repression of damages, it will not defeat the action in toto. It follows that the court committed no error in refusing defendant's charge nine.

Charges 20, 21, 22, and 23 were invasive of the province of the jury, in that defendant sought to have the court to instruct the jury that the plaintiff's intestate was guilty of contributory negligence as a matter of law. In view of the fact that the evidence shows that the box car had successfully passed the plaintiff's intestate without injuring him, and that he was injured most probably by reason of the fact that rerailers attached to the tender extended beyond the sides of the tender, we cannot say as a matter of law that plaintiff's intestate was guilty of contributory negligence as hypothesized. The charges were each therefore bad.

Assuming, without deciding, that charge 19, requested by the defendant, invokes the defense of assumption of risk and not contributory negligence, it was bad, in that it omits all consideration of knowledge on the part of George Bennett that he was then in a position where the tender, or some part of it, would probably strike him, and of the appreciation by plaintiff's intestate of the risk. The charge also withdraws from the jury any consideration of negligence on the part of the engineer and the foreman of the switching crew. The employee is not to be held to have assumed the risk due to the negligence of his fellow employees until he becomes aware of the same, and appreciates the danger incident thereto.

In the case of Chesapeake & Ohio R. Co. v. Proffitt, 241 U. S. 462, 36 S. Ct. 620, 622, 60 L. Ed. 1102, it is said: "Even if plaintiff knew and assumed the risk of an inherently dangerous method of doing the work, he did not assume the increased risk attributable not to the method, but to negligence in pursuing it."

That is to say, the employee "assumes the risk normally incident" to his employment, not such a risk as may arise from the failure of some other employee to use due care so as to enable his coemployee to discharge the duties of his employment without due peril.

For like reasons charges A and 11 were refused without error.

Charge 12, if not otherwise bad, pretermits intestate's appreciation of his danger, and was refused without error.

We have given most careful consideration to defendant's motion for new trial made in the court below, and there denied. Under the rule declared in Cobb v. Malone, 92 Ala. 630, 9 So. 738, we do not feel warranted in setting aside the verdict upon any ground of the motion pressed upon our attention. No errors appearing in the record, it follows that the judgment of the circuit court is due to be here affirmed.

Affirmed.

ANDERSON, C. J., and THOMAS and BROWN, JJ., concur.