198 So. 588

**SOUTHERN RY. CO. v. MELTON.**

6 Div. 555.

Supreme Court of Alabama.

Oct. 24, 1940.

Rehearing Denied Nov. 22, 1940.

Stokely, Scrivner, Dominick & Smith, of Birmingham, for appellant.

Smith, Windham, Jackson & Rives, of Birmingham, for appellee.

248

FOSTER, Justice.

This is an action under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., for the death of W. C. Melton. It was tried on count No. 1.

The first question here presented relates to the sufficiency of that count tested by demurrer on the ground that it does not sufficiently show that decedent was engaged in service for defendant in interstate commerce. The insistence is that it shows that he was then so employed, but not then so engaged in such nature of employment.

As amended, the count contains the following allegations in that connection: "Said Melton was an employee of the defendant and as such employee of the defendant, and while acting within the line and scope of his employment by the defendant, was engaged in working in and about defendant's track and the signal system connected therewith, at said point on said track approximately forty-one hundred feet east or northeast of the corporate limits of Athens, Tennessee, in checking and inspecting the signal system or the switch or switches on said track, which plaintiff avers was the track used by the defendant in the transportation of interstate commerce, and the plaintiff further avers that the said inspection and checking of said signal system or switch or switches on the defendant's said track were in furtherance of interstate commerce in that said signal system and switch and switches were for the use, regulation and safety of interstate traffic and interstate commerce."

The principle for which appellant contends is well supported,—St. Louis & S. F. R. R. Co. v. Dorman, 205 Ala. 609, 89 So. 70; Adams v. Southern Ry. Co., 166 Ala. 449, 51 So. 987,—but we think the allegations of the count as amended sufficiently comply with the requirement.

*Assignment of error No. 6: Refusal of the affirmative charge.*

The defendant requested the affirmative charge which is argued in two aspects: (1) that the evidence failed to show that deceased at the time of his injuries was employed in interstate commerce and so acting, and was then and there engaged in the performance of such character of service; and (2) that the evidence failed to show that the injuries received by him were proximately caused by negligence on the part of defendant.

We will state the tendencies of such features of the evidence necessary to a consideration of each contention. The evidence relating to each being separately stated, and much abbreviated, and for the purpose of determining its sufficiency to present a jury question. The question now to be considered is whether deceased was at the time of his injuries actually engaged in service for defendant in interstate commerce. Of course servicing the signals and switches on the track used in interstate commerce is such service. The track was so used.

Near the Duggan Farm crossing there was a spring switch west of it and two signals east of it, and one circuit controller connected to the spring switch. The spring switches were to be inspected once each week, and the circuit controllers

twice a month and all signals at least once each month. There was a circuit controller with each spring switch and there were others not so connected. But when a spring switch was inspected, the circuit controller so connected was also due to be inspected. To inspect the spring switch to see whether it is closing properly a ball peen hammer and watch would suffice. But to inspect it and the circuit controller at the same time, or the circuit controllers separately, he should have an oil can and oil, a big wrench and one or two others, and a screw driver. The servicing could not be done with a ball peen hammer only.

Decedent was the inspector and he had with him his assistant, one Highsmith, and the section foreman Thomas, and had no other tools than a ball peen hammer. Those three men often worked together. He wore his work clothes. He could go to this crossing to make the inspection in his automobile. But in doing so, it would not be convenient to inspect other switches or signal controllers. He was furnished with a railroad motorcar in which to travel along the railroad with tools in it to do this service; but was not prohibited to use his automobile when convenient, though advised not to do so. On this occasion he had a cold, and his automobile afforded better protection than an open railroad motorcar. He lived at Athens, Tennessee, less than a mile west of the Duggan crossing. He customarily drove to the station in his automobile, parked it, and took out his railroad car to use for inspection.

On the morning of the accident, about 7 o'clock, Melton, Highsmith and Thomas went into a hardware store at Athens and purchased pistol cartridges. After the accident three pistols were taken out of the car. At about 9:30 that morning they were in Niota, about four miles east of Duggan Farm crossing, with Melton driving the car, and he drove off towards Athens. They were all killed at this crossing at 9:50, by a train known as "2nd-17", that is, a second section of No. 17 from Knoxville to Chattanooga, running two hours and fifty minutes later than its regular schedule. Melton owned the car and was driving it when last seen, and presumably at the time of the accident. The day was Friday, December 24, 1937, but not a holiday for these men. Melton was supposed to be on duty Monday through Friday of each week. He was not due to report to anyone for duty, but made a report each night of that day's work in detail. He had no specified or customary system for doing each day's work.

On or before leaving the Athens station when he went on an inspection, he was required to get a line-up of the trains to pass his territory that day, and have an official time table, look out for and keep clear of trains, and not stop them by his inspections affecting the signals. That morning he did obtain that line-up and had it with him.

The Duggan Farm road terminated for practical purposes at the Duggan Farm houses. It principally served that farm, but was for the use of the public, whether a public road or not. In crossing the railroad at that place, there was no where specially to go, except to the Duggan Farm with which none of the automobile occupants had any connection. They are not shown to have had any business there or purpose in going. So that it was a day when deceased was supposed to be on duty, at a place where he could be so engaged, though without all the customary tools to do the whole job, was traveling in an unusual way when on duty, though not prohibited, and when there appears no other reason for his being there. The signal at the crossing had last been inspected on December 17th, just a week before that day, and the circuit controller and spring switch on December 16th. There was no signal failure reported to have existed at that place and time. If he was making an inspection it was routine.

We have not undertaken to set out all the evidence which tends to show that he was not engaged in the performance of service in inspecting the signals and switches admittedly used in interstate commerce. We need not weigh the effect of any of the evidence except to determine if there is substantial evidence, more than a scintilla, to sustain a finding that he was so engaged. The scintilla rule of evidence, ordinarily applicable in Alabama practice, does not apply under the Federal Employers' Liability Act. Pennsylvania R. Co. v. Chamberlain, 288 U.S. 333, 53 S.Ct. 391, 77 L.Ed. 819; Western & Atlantic R. Co. v. Hughes, 278 U.S. 496, 49 S.Ct. 231, 73 L.Ed. 473; Chicago, M. & St. P. Ry. Co. v. Coogan, 271 U.S. 472, 46 S.Ct. 564, 70 L.Ed. 1041; L. & N. R. R. Co. v. Grizzard, 238 Ala. 49, 189 So. 203; Southern Ry. Co. v. Glenn, 228 Ala. 563, 154 So. 792; Birmingham Belt R. Co. v. Bennett,

250

226 Ala. 185, 146 So. 265; Illinois Cent. R. Co. v. Johnston, 205 Ala. 1, 87 So. 866.

Much argument is made for appellant that the circumstances show only a possibility of his being engaged in his duties, and when considered in the light of other circumstances do not present a situation from which such an inference is fairly to be deduced by a reasonable jury. We are not now concerned with the weight of the evidence, except as it bears on one question.

■ We think from the evidence the situation is more than one where the purpose of decedent and his companions is not deducible from the circumstances with any degree of satisfactory result. He was at a place at a time when it was his duty to make an inspection. The spring switches were at sidings not infrequently near a station and public road to which he could go by automobile. This was probably not a public road, but one available to him, and no plausible reason is advanced for his being there for another purpose; and at a place where he probably would not go without some special reason. That there are circumstances which tend strongly to show that he probably would not have thus made an inspection only furnish occasion for a verdict of the jury, thereby making the question one properly submitted to them. We do not think there was error in that aspect of the contention.

The second aspect of the argument by appellant on the refusal of the general charge is that the question of negligence should not on the evidence have been submitted to the jury.

We will refer to the most important features of the evidence in that connection. In going south to the crossing from the highway, the road was descending to a small bridge across a drain from which it began to ascend for about one hundred feet to the level of the track about eight feet higher. The country all about was an open field. The track was straight in both directions for about half a mile, with no obstructions. The right of way was marked by a woven wire fence. East of the crossing it was on an elevation of about two feet above the track which somewhat affected the ability to see a train coming from that direction. But a train coming from the east at such a place was visible in whole or in part substantially for half a mile or more at any point on that cross-road. There were gates across the road in the right of way fences, north and south,

but it does not appear whether they were standing open. On the land was a corn crop, cut and in stacks. The foliage on all plants was dead on December 24th.

■ This was in Tennessee where the law put the burden on county road overseers to place a crossing sign at every public road crossing a railroad, and, if not so marked, no approaching signals were required by law of trains at such places. This crossing was not so marked. But there was much evidence that the usual crossing signals were given, but the testimony of one witness tended to show otherwise. However, it was of a negative sort. The evidence is very strong to show that they were given. In fact, it was virtually conceded in the oral argument that no primary duty to decedent was breached. There was no duty owing to him to keep a lookout for decedent, whereas it was his duty to keep a line-up on all trains, and watch out for them and keep out of their way. There was no breach of duty to him in maintaining a schedule speed of sixty miles an hour, and the court so charged the jury.

The contention is that of subsequent negligence, or that which occurred after the engineer discovered the danger in which decedent placed himself. It is not necessary to analyze his conduct in respect to his own alleged contributory negligence in this aspect of the discussion.

The witness McCullough, living in the Duggan house, testified that he saw the automobile turn off of the highway and travel toward the track, which was also toward his house in which he was sitting; that he thought it was a doctor answering his call, and went out on the porch facing east; that he had not heard anything until he got on the porch, when he heard the train blowing short blows and saw it slowing down trying to stop. The engine and two coaches had passed the crossing going west when he first heard the blows of the whistle. Before he went on the porch he was shut up in the house on a cold day, as it was, and was not listening for trains, nor having them in mind. The automobile was moving up the incline toward the track at about ten miles an hour, and was so moving when he last saw it through the window before going on the porch; it took him about a minute to straighten up the room and go out on the porch. That he heard the train blow as soon as he opened the door; that the engine and two coaches

were then west of the crossing; that the train was trying to stop; that it was running as much as fifty miles an hour or more when he first saw it.

The conductor Swats testified that he was on the train in the performance of his duties; that as the train approached the crossing where the accident occurred, the engineer blew the crossing signal, and the station blow for Athens; that he had passengers for Athens, and that the rules required him to signal the engineer to stop there; that he was checking on the engineer for that purpose, but he also heard the crossing signal; that he signaled the engineer and then went ahead to get ready to unload the passengers and did not pay any more attention to signals, and was not listening for them, but did not hear the train blow just before it stopped, as he was not listening at that time, and with the brakes applied he couldn't hear anything.

The negative evidence of the witnesses McCullough and Swats is all there was tending to show that the warning whistle was not blown.

The engineer testified that he had experience of thirty-four years as a locomotive engineer. That he was running at the schedule rate of sixty miles an hour approaching this crossing. He was on the right side from which decedent approached the track. There was another crossing about half a mile east of this one, and he had sounded the crossing signal one quarter of a mile east of it, passing it, he sounded the station signal for Athens, one mile from it, all before reaching the Duggan crossing, and also sounded a crossing signal for the Duggan crossing, and the engine bell was ringing automatically. That it was his duty to watch the block signal at that crossing as he approached it; that he was doing that to see whether the signal would turn red, requiring an emergency stop. That in his judgment, the front end of the engine was about two hundred feet (later he put it at three hundred feet) from the crossing: that the automobile was then coming out onto the right of way from behind the fence on the north side of the track, about fifteen or twenty feet from the nearest rail, moving slowly. He blew the whistle and saw the automobile speed up, and he applied the brakes in emergency, shut off steam and opened the sand box, which was all he could do to stop the train of an engine with tender and seven coaches. It took three or four sec-

onds, in his judgment, to do these acts. The train was traveling, as estimated, eighty-eight feet a second at that rate. It was going up grade and was working steam; the brakes take about six or seven seconds to be effective throughout the train. The answers to interrogatories to defendant stated that the pilot of the engine was three hundred or four hundred feet from the crossing when the engineer first saw the automobile. The engineer then testified that he could not measure the distance; that he gave the information as to this distance to the claim agent to answer the interrogatories, and now says that in his judgment the front end of the engine was close to three hundred feet from the crossing when he first saw the automobile.

The baggage master on the train testified that the warning signal of one continuous blow was given after the station and crossing signals, and the brakes went on while he was blowing this signal.

The witness Hutsell, living on a near-by dairy farm, testified that he heard the crossing signal and in a few seconds heard it blow an alarm signal of two short blows, then he heard the crash; that he looked and saw the train at the crossing and the wrecked automobile. He had signed a somewhat different statement to one of plaintiff's counsel, which he says was wrong.

It is not contended that anyone on defendant's account was negligent as here applied, except the engineer, nor that he breached any duty owing decedent until he discovered the peril of decedent. The court properly charged out of consideration all primary negligence, such as the speed of the train, keeping a lookout, and giving the usual signals. The only issue, as appellee concedes, relates to subsequent negligence.

It is contended by appellee that this evidence of immediate action by the engineer shows that he recognized the danger as soon as he saw the automobile fifteen or twenty feet away, moving slowly, but he denies that the engineer did the act immediately, which shows that he did recognize the danger, but insists that he did not thus act as he testified. Appellee accepts the engineer's evidence of a fact to prove his case, but denies the fact as having another adverse tendency. He says he felt the brakes go on before he reached the crossing. This it is argued is inconsistent,

since in six or seven seconds he would have passed it. But we cannot know that he could not have felt the brakes in the engine before it became effective throughout the train.

Other witnesses testified to the warning signal and hearing it. All do not agree as to the character of the warning signal. But when conduct occurs in seconds of time, few people will agree in precise detail. The conflict was as to whether the warning signal then given was a long blast, or several short ones. But the question is whether the whistle was sounded as a warning and as soon as the danger was discovered by the engineer. ·

Appellee argues that in two respects the question of subsequent negligence was properly left to the jury, i. e., (1) delay in blowing the whistle as a warning signal, and (2) a failure to reverse the engine to reduce the speed.

We have shown that the only evidence tending to conflict with that of the engineer and several others as to whether the warning blast of the whistle was given was that of the tenant McCullough in the Duggan Farm house, and of the conductor Swats, if that is the nature of such evidence. On the second contention noted above, we here observe that the engineer testified that it would not have been helpful to stop the train any quicker, if he had reversed the engine. There was no conflicting evidence on that point.

 But did the engineer owe a duty to blow the whistle again after discovery of the automobile? Before discovering it he had blown a signal from the whistle three times within a few seconds. The old crossing was half a mile east of the Duggan crossing. He had blown for this crossing a quarter of a mile east of it. Traveling at sixty miles an hour or a mile a minute, this was one-fourth of a minute or fifteen seconds before reaching the old crossing. He then blew for Athens after passing the old crossing, and the signal for the Duggan crossing, also about a quarter of a mile from it, or fifteen seconds at most from it. He was about four seconds from the crossing when he discovered the automobile. He had blown two signals in about fifteen seconds before seeing the automobile, and another about thirty seconds. He had a right to assume that the decedent could see and hear normally. There is nothing to the contrary. After he had blown three signals within fifteen to thirty seconds, would another have probably averted the accident? The chances are too slim on which to base a verdict.

Again, the important question is the exact moment when the engineer discovered the peril of decedent, not when he discovered the automobile. The only evidence is that he saw the automobile approaching slowly, about ten miles an hour, when it was fifteen or twenty feet from the nearest rail, on an up-grade, at a time when the train was in view at least in part in an open country on a straight track, after three signals had been given within a few seconds. He knew that the automobile could stop to avoid a collision, but he says he took the precaution to blow again. This does not necessarily show that he considered the danger then imminent, but, if so, it also shows that he did the appropriate thing. If he did not thus blow, when did he discover that the danger was imminent? The burden is on plaintiff to show, and to show that he did not do what he could to avert it.

 In this suit the kind and amount of evidence required to establish it is not subject to the control of the several states. The statutes imposing the burden of proof on the defendant to acquit itself of negligence have no application. The court will on appeal examine the record, and if it is found that the evidence is not sufficient to sustain the finding of liability, the judgment will be reversed. Chicago, M. & St. P. Ry. Co. v. Coogan, 271 U.S. 472, 46 S.Ct. 564, 70 L.Ed. 1041; New Orleans & N. E. R. R. Co. v. Harris, 247 U.S. 367, 38 S.Ct. 535, 62 L.Ed. 1167.

 In this suit, negligence, either primary or subsequent, is essential to a recovery, and the burden of proof to establish it is on the plaintiff.

Generally, under our practice, the general charge should be refused to defendant if there is a scintilla of evidence on which plaintiff's case may hang, even a "slender thread." But, as has often been pointed out and as referred to in our case of Birmingham Belt R. R. Co. v. Bennett, 226 Ala. 185, 146 So. 265, 268, in such a one as this, the scintilla rule does not prevail, and the issue will not be submitted to the jury "unless the evidence be of such a character that it would warrant the jury to proceed in finding a verdict in favor of the party introducing such evidence," and on whom the burden of proof is cast.

■ The evidence is not positive that the engineer did not give a warning of danger by blowing the whistle as soon as he could after discovering it. The evidence of McCullough and Swats is not at all substantial in denying that the signal was given. A verdict should not be sustained under this rule on such unsubstantial evidence in the light of the well-corroborated evidence that the signal was given. And, as to reversing the engine, this Court held in Harris v. Nashville, C. & St. L. R. R. Co., 153 Ala. 139, 44 So. 962, 14 L.R.A.,N.S., 686, that in the light of the engineer's evidence in that connection, there was no question for the jury.

Moreover, when the principle of "last clear chance" is involved, the incidents must be clearly analyzed to see if it applies. We quote as follows from St. Louis & S. W. Ry. Co. v. Simpson, 286 U.S. 346, 52 S.Ct. 520, 521, 76 L.Ed. 1152, by Justice Cardozo: "Negligent he [the conductor] may have been, but not recklessly indifferent to a duty to counteract a peril perceived and understood. Woloszynowski v. New York C. R. R. Co., 254 N.Y. 206, 172 N.E. 471; Inland & Seaboard Coasting Co. v. Tolson, 139 U.S. 551, 558, 11 S.Ct. 653, 35 L.Ed. 270. In the second place, the negligence of the engineer [decedent] and the negligence of the conductor were substantially concurrent. The negligence of the engineer was a continuing one (St. Louis & San Francisco Ry. Co. v. Schumacher, 152 U.S. 77, 81, 14 S.Ct. 479, 38 L.Ed. 361), for he was under a duty from the moment that he went out on the main track to return to a place of safety. The negligence of the conductor in failing to give warning was not separated by any considerable interval from the consequences to be averted, nor is there any satisfactory proof that warning, if given, would have been effective to avert them. The transaction from start to finish must have been a matter of seconds only. In the brief for the respondent nice calculations are submitted in an attempt to prove that, if the conductor had applied the brakes at once, his train could have been stopped at a point that would have separated it by a space of approximately half a mile from train No. 18 rushing on from the south, and that, if all this had happened, the engineer of No. 18 might have noticed the stationary train in time to stop his own and thus prevent collision. Calculations so nice are unavailing to prove anything except the unity of the whole transaction. The several acts of negligence were too closely welded together in time as well as in quality to be viewed as independent."

■ In the instant case, decedent, if on duty as contended, was under a specific burden to watch out for and avoid trains operated in the usual way. Chesapeake & O. Ry. Co. v. Nixon, 271 U.S. 218, 46 S.Ct. 495, 70 L.Ed. 914. This was a continuing duty up to the very time of the impact, and whether he had actual knowledge of his imminent danger or the alleged negligence of the engineer or not. This duty was not conditioned on such knowledge, and was concurrent with and even subsequent to the engineer's negligence if possible. His duty was so welded with everything which immediately transpired then and there in terms of a few seconds as to make them all parts of an unified act in which the doctrine of last clear chance does not apply under the authority of St. Louis & S. W. Ry. Co. v. Simpson, supra.

■ We are not analyzing this situation according to the effect of our cases. They do not apply, both because this is governed by the federal rule and because the accident occurred in Tennessee. We are not called upon to say whether under our decisions there was no occasion here for the last clear chance rule. See Southern Ry. Co. v. Miller, 226 Ala. 366, 147 So. 149. But we cannot distinguish this case in principle in that respect from the Simpson case, supra, which is binding on all state courts applying the Federal Employers' Liability Act.

It is our opinion that the affirmative charge should have been given for appellant, and there was error in its refusal.

Reversed and remanded.

GARDNER, C. J., and BOULDIN and LIVINGSTON, JJ., concur.