Linnie R. Stott, Administratrix of Estate of Robert M. Stott, Deceased, Appellee, v. Guy A. Thompson, Trustee of The Missouri Pacific Railroad Company, Appellant.

Opinion filed March 9, 1938. Rehearing denied April 15, 1938.

JOSIAH WHITNEL, of East St. Louis, and RALPH D. WALKER, St. Louis, Mo., for appellant; THOMAS T. RAILEY, of St. Louis, Mo., and WHITNEL, BROWNING & WALKER, of counsel.

MARK D. EAGLETON and ROBERTS P. ELAM, both of St. Louis, Mo., and JOSEPH McGLYNN, of East St. Louis, for appellee; McGLYNN & McGLYNN and EAGLETON, WAECHTER, YOST, ELAM & CLARK, of counsel.

MR. PRESIDING JUSTICE STONE delivered the opinion of the court.

Linnie R. Stott, appellee, as administratrix of the estate of Robert M. Stott, deceased, filed her suit at law against Guy A. Thompson, trustee of the Missouri Pacific Railroad Company, to recover damages for the dependent next of kin of the deceased, on the theory

that the death of Robert M. Stott was due to a violation by the defendant of the Federal Safety Appliance Act and the Federal Employers' Liability Act. Appellant contended the Federal Longshoremen's and Harbor Workers' Compensation Act controlled liability. She recovered a verdict and judgment for $35,000. Appellant seeks a reversal in this court.

The complaint charges the defendant was a trustee, appointed by the United States District Court, Eastern District of Missouri, of the Missouri Pacific Railroad Company, and was operating said railroad as a common carrier in interstate commerce. That on June 14, 1936, Robert M. Stott was employed by the defendant as a switchman. That he was working with cars which were "Then and there being moved and transported" from the State of Missouri to the State of Illinois, by reason whereof he and the defendant were subject to the Federal Employers' Liability Act and the Federal Safety Appliance Act. That the defendant disregarded his duty to equip a certain coal car with secure ladders, as required by law, and that while plaintiff's intestate was climbing such insecure ladder, and while in the usual course of his employment, the handhold broke and he fell into the Mississippi River and drowned. That at the time of his fall into the river Stott was "upon that portion of said car which was on a structure known as the 'apron' or upon a 'cradle' adjoining said apron, said apron and cradle being a permanent part of the land structure used by defendant from said car into the Mississippi River, which flowed under said apron and cradle."

The answer admitted the employment of the plaintiff's intestate and averred "it was also the work and employment of said Robert M. Stott to work in, on and about this defendant's cars while the same were on a certain ferryboat known as the 'Steamer Willard V. King,' and to work in connection with the removal of

said railroad cars from on said boat, and in connection with the movement of cars from land onto said boat,'' which boat was operated between the States of Illinois and Missouri across the Mississippi River, which was averred to be a part of the ''navigable waters of the United States''; that at times Robert M. Stott performed duties for the defendant where their relations were governed by the Federal Employers' Liability Act and the Federal Safety Appliance Act, ''but denies that at the time and place mentioned in plaintiff's complaint that either the defendant or said Robert M. Stott were subject to the provisions of said Federal Employers' Liability Act and said Federal Safety Appliance Act, and states that at all times and places mentioned in plaintiff's complaint, and at the time of the accidental death of said Robert M. Stott, which in paragraph 8 of said complaint is pleaded, both the defendant and said Robert M. Stott were subject to the provisions of what is commonly known as the 'Longshoremen's and Harbor Workers' Compensation Act' (33 U. S. C. A. 901–950), for the reason that said accidental death occurred upon the navigable waters of the United States,'' and ''liability between the parties is governed'' by the Longshoremen's and Harbor Workers' Compensations, and not by the Federal Employers' Liability Act (45 U. S. C. A. 51–59) and the Federal Safety Appliance Act (45 U. S. C. A. 1–16). Averments of the complaint, with reference to the insecure handhold, were denied; and also it was denied that the ''accident out of which the death of said Robert M. Stott arose occurred upon the land or upon any structure which was then a permanent part of the land within the meaning of the Longshoremen's and Harbor Workers' Compensation Act of the United States, but, on the contrary, . . . the death of said Robert M. Stott arose out of an accident which occurred upon the navigable waters of the United States within the meaning

of the Longshoremen's and Harbor Workers' Compensation Act of the United States.''

By an amendment to the answer the defendant pleaded ''that said Robert M. Stott at the time of and immediately before his accidental death, as described in the complaint, was assisting in the removal of railroad freight cars from a ferryboat which had been ferried across the Mississippi River from the Missouri side to the Illinois side of said river, which said ferryboat was owned controlled and was then being operated by the defendant, and which said ferryboat was then manned by other of defendant's employees who then constituted the crew thereof; and this defendant says that at the time said Robert M. Stott fell into the Mississippi River and was drowned, both he and the defendant were engaged in maritime employment on the navigable waters of the United States, to wit, the Mississippi River, and that by reason of such employment and the fatal injuries sustained by Robert M. Stott, as aforesaid, both the defendant and said Robert M. Stott became and were subject to the provisions of the Longshoremen's and Harbor Workers' Compensation Act (33 U. S. C. A. 901–950), and which act provides for the exclusiveness of liability (33 U. S. C. A. 905) ; and that pursuant to the provisions of said statute any right of action of the plaintiff under and pursuant to the Federal Employers' Liability Act, and/or Federal Safety Appliance Act, is barred and nullified, said Longshoremen's and Harbor Workers' Compensation Act specifically providing that said act shall be exclusive and in place of all other liability of this defendant to the plaintiff.'' Wherefore the defendant contended the court had no jurisdiction and prayed that the cause be dismissed.

The plaintiff replied, admitting Robert M. Stott ''did also work in, on and about defendant's cars while the same were on a certain ferry boat known as the

'Steamer Willard V. King,' and do work in connection with the removal of railroad cars on said boat''; that the Steamer Willard V. King was operated between Illinois and Missouri over the Mississippi River, a part of the navigable waters of the United States. Denied that at the time of the death of Robert M. Stott he and the defendant were subject to the Longshoremen's Act, and denied ''that said occurrence occurred upon the navigable waters of the United States''; denied that liability was governed by the Longshoremen's Act. Denied that the death of Robert M. Stott occurred while he was working on the navigable waters of the United States and before he had reached the land; and denied that the death arose out of an accident which occurred upon the navigable waters of the United States, within the meaning of the Longshoremen's Act. Denied that Robert M. Stott, ''at the time of and immediately before his death . . . was assisting in the removal of railroad freight cars from a railroad ferry boat which had been ferried across the Mississippi from the Missouri side to the Illinois side of such river.'' And denied that the parties were subject to the provisions of the Longshoremen's and Harbor Workers' Compensation Act and ''denies that pursuant to the provisions of said Longshoremen's and Harbor Workers' Compensation Act it has the effect of barring or nullifying the right of action of this plaintiff under and pursuant to the Federal Employers' Liability Act and the Federal Safety Appliance Act, or either of them, for the reason that the death of said Robert M. Stott, as pleaded in paragraph 8 of plaintiff's complaint, did not occur upon the navigable waters of the United States within the meaning of the said Longshoremen's and Harbor Workers' Compensation Act, but on the contrary, plaintiff alleges that the death of said Robert M. Stott, as pleaded in paragraph 8 of plaintiff's complaint, occurred at a time when he was

not engaged in maritime employment on the navigable waters of the United States, and at a time and place when both the said Robert M. Stott and the defendant were engaged in interstate commerce and within the application of the Federal Employers' Liability Act (45 U. S. C. A., Sections 51–59) and the Federal Safety Appliance Act (45 U. S. C. A., Sections 1–16), and that liability between the parties is controlled by said Federal Employers' Liability Act and Federal Safety Appliance Act.''

Motions to direct a verdict for the defendant were offered at the close of the plaintiff's testimony, and of all the testimony.

After verdict, appellant's motions for judgment notwithstanding verdict and for new trial were denied.

Appellant operates lines of railroad in the States of Illinois and Missouri. He also operates the Steamer Willard V. King on the Mississippi River as a car ferry between East Ivory, St. Clair county, Illinois, and St. Louis, Missouri. This car ferry is a river steamboat with two tracks running from stem to stern in the center of the boat. Each track is capable of carrying seven railroad cars.

The water stage of the Mississippi River has a maximum variation of 40 feet, and the stage of the river at the point of the ferry varies from day to day. To accommodate the car ferry to changes in elevation of water, the defendant constructed two tracks on an incline from above maximum high water down into the river to approximately six feet below the extreme low water level. The tracks are laid upon a timber trestle, which consists of pile bents driven into the river bed and bank. To enable engines and cars to be taken from the ferry to the railroad, the defendant used a ''cradle'' and ''apron,'' which also carry two tracks. The cradle is a wedge-shaped structure resting on wheels which vary in size from standard freight car

wheels at the river end to smaller wheels at the land end, where there is a sliding shoe. The cradle is constructed of timber. At the river end the bottom of the cradle is normally submerged under five or six feet of water.

The apron is of steel construction, 31 feet long, and is connected to the cradle by two pins. The apron and cradle carry two railroad tracks by which engine and cars may be moved from the boat to the land. Defendant's exhibit 1 illustrates this mechanism and the relationship between the boat, apron and the cradle.

The apron and cradle are moved up and down the incline, so that the rails on the river end of the cradle are at approximately the same level as the rails on the boat. The apron being movable on a hinge, accommodates the slight variances in elevation. When the boat is not connected to the apron, the apron sags down (see plaintiff's exhibit), and as the boat approaches, the scoop or pick-up goes under the apron and raises it to the elevation of the rails on the boat. As the boat comes in the apron girder is raised up to the girder set (on the boat) and the end of the apron girder contacts with the steel face of the boat. The momentum of the boat, as it makes connection with the apron, will shove the apron and cradle up the incline for several feet. The river end of the apron is provided with four turnbuckle connections, one on each rail. These turnbuckles are placed upon a pin and tightened, so that when in position it is not possible for the boat to move from the apron and cradle, or the apron and cradle from the boat. When in position the situation is as illustrated by plaintiff's exhibit 1.

The cradle and apron are pulled back and forth on the incline by sheaves, which are two big sets of pulleys with wire rope loosely woven in between. One end of the wire rope is attached, but the other (except when an engine is pulling) is loose, so that the rope may be

entirely disengaged from the sheaves. One sheave is attached to the cradle and the other sheave is moved between various pulling points, called stations, on the shore. The sheave which is moved from station to station is attached by a "U" coupling called a shackle. This shackle has a hole through each bar and is attached to the various stations by a bolt or pin which drops vertically. This pin is pulled out by hand. The wire rope between the sheaves is loose except when it is in use.

The boat carries up to 14 cars. These cars loaded weigh from 80 to 110 tons each. The engine weighs approximately 150 tons, so the total maximum weight which might be taken from the boat across the apron and cradle would equal 1,690 tons. The cradle weighs approximately 300 tons and the apron approximately 15 tons.

At 9 o'clock on the evening of June 14, 1936, the steamer Willard V. King brought 14 cars from the Missouri side to the Illinois side of the Mississippi River. Its prow was affixed to the apron and the rails of the boat aligned with the rails on the apron by the turnbuckles heretofore described. It was the duty of a railroad switch crew, consisting of Robert M. Stott, foreman; engineer Hartsell and brakemen Hulsey and Chapman, to remove the cars from the boat. The engine backed down the incline onto the cradle, over the apron onto the boat, and was coupled to the string of seven cars on the left side of the boat. These cars were pulled off the boat, crossed over, came back and were connected to the string of seven cars on the right side of the boat.

Foreman Stott and switchman Hulsey had come down with the engine and gotten off on the boat. Stott stayed at the head end of the boat. He coupled the engine onto the first string of cars. At that time the tender of the engine was on the boat. Stott signaled

the engineer, who pulled the first cut of cars over the apron, cradle, up the incline and, with the first cut, came back on the boat to get the second cut. He then (while still on the boat) coupled the first cut of cars to the second cut. In the meanwhile switchman Hulsey went to the rear end of the second cut and gave signal to release the brakes, whereupon the engine started to pull the second cut off the boat.

Appellee's witness, Hulsey, the rear brakeman of the crew, was the only person who saw the accident. His testimony is uncontroverted and is as follows:

Hulsey got on the rear (the west end) of the rear car (Mo. Pac. 58236). As the car approached the front of the boat Stott was standing on the boat on a platform. Stott caught the front (east end) of the car on which Hulsey was riding and started climbing up the ladder. Stott fell when his head and hands were between the first and second rounds from the top of the ladder. His hand was reaching up. He was in a climbing motion. He pitched backward into the water. At the time he fell from the car, Hulsey testified, Stott was "towards the east end of the apron," and that he fell "about midways of the apron." When Stott fell from the car he was about halfway across the apron. Assuming the apron is 31 feet long, he was about 15½ feet from the cradle. At that time more than half of the coal car on which he was riding was on the boat. As Stott fell, Hulsey gave an emergency stop signal and when the train stopped Hulsey stepped from the railroad car onto the boat.

No member of the crew noticed anything wrong with the handholds at the time. Car Mo. Pac. 58236 was inspected by Harry Smith about 11:30 p. m. on the night of June 14, 1936. He testified that the top grabiron on the east end was broken off, being broken off up to the bend, with an inch or inch and a half of stub remaining. One stub looked to be entirely rusted over and

the other was about one-fifth bright and the rest rusty. The rest of the handholds were in proper position.

Robert Stott was not a master or a member of the crew of the Steamer King. The Steamer King had a tonnage of 1,103 tons net and was a vessel of over 18 tons net. It is admitted that the Mississippi River is a part of the navigable waters of the United States. Appellant had secured the payment of compensation under the Longshoremen's Act and introduced in evidence as its exhibit 5 a certificate by deputy commissioner of the United States Employees' Compensation Commission that appellant had "Complied with the provisions of the Longshoremen's and Harbor Workers' Compensation Act . . . His certificate expires June 30, 1936." Notice had been posted on the boat to the effect that appellant "has complied with the provisions of the Federal Longshoremen's and Harbor Workers' Compensation Law . . ." and "has secured the payment of compensation thereunder; and appellee's counsel stated he was "making no point on failure to post notices."

Linnie Stott filed application for compensation with the United States Employees' Compensation Commission, and appellant admitted the applicability of said Compensation Act—see appellant's answer filed with the United States Employee's Compensation Commission.

Robert Stott would have been forty-two years old in August, 1936. He left surviving, his widow Linnie R. Stott, forty years of age; Donald, eighteen; Loyd, fifteen; Ruth Ellen, six, and Marvin, four years of age. The widow testified that prior to his death, he gave her $80 every two weeks. She used the money for herself and the children and to supply the home. Stott lived with the family. His health was good. He had been foreman, employed by the railroad, for sixteen years and earned approximately $220 per month.

The court gave two instructions for appellee, one of which was modified and read three times, and refused eleven instructions, which were offered by the appellant.

Appellant assigns the following errors:

1. The court erred in refusing to instruct the jury to return a verdict in appellant's favor, in refusing to render judgment for appellant notwithstanding the verdict, and in refusing to allow appellant's motion for a new trial, having no jurisdiction of the subject matter of the suit.

2. On the record, as a matter of law, the case was one which was controlled by the Longshoremen's and Harbor Workers' Compensation Act, and neither the Federal Employers' Liability Act nor the Federal Safety Appliance Act, were, under the undisputed facts, applicable.

3. The court erred in giving, as modified, and in three times reading plaintiff's given instruction with reference to the duty of appellant to equip its railroad cars with secure side ladders.

4. The court erred in refusing to give each of the eleven instructions offered by appellant and refused by the court.

5. The verdict and judgment are in an amount which is excessive and indicates the passion and prejudice of the jury.

This case like the case of the *Admiral Peoples,* 295 U. S. 649, might be considered one of the border cases. The concessions of the parties, as well as what we regard as well settled principles of law, have reduced the issues in this case to a rather narrow compass, notwithstanding the closeness, the fine distinctions involved and the importance of this case both for what it decides and the amount involved.

The locality of the tort in this case is the sole test of jurisdiction. If Stott's death resulted from a tort

within the admiralty jurisdiction the liability of appellant for such death was governed solely by the Longshoremen's and Harbor Workers' Compensation Act. This act is applicable to railroad employees while engaged in maritime employment upon the navigable waters of the United States. (*Nogueira v. New York, N. H. & H. R. Co.*, 281 U. S. 128.) Conversely, if Stott's death resulted from a tort without the admiralty jurisdiction, the liability, if any, of the appellant for such death, was governed by the Federal Employers' Liability Act and the Federal Safety Appliance Act.

There is little or no disagreement as to the facts of this case. Hence the question for decision is whether under the circumstances of this case, the accident which resulted in the death of plaintiff's intestate, should be termed a water accident or a land accident.

The leading case upon this question is the decision of the Supreme Court of the United States in the *Admiral Peoples* (*Kenward v. Admiral Peoples et al.*), 295 U. S. 649, and is relied upon by both parties to this appeal. In the *Admiral Peoples* case, the libelant was a passenger on a steamship, and while disembarking, she was injured by falling from the end of a gangplank leading from the steamship to the dock. The evidence established that the gangplank sloped from the ship toward the dock at an angle of from 10 to 15 degrees; that it was approximately two feet in width and eighteen feet in length, and was equipped with the usual rope railing which terminated approximately three feet from each end; that the level of the gangplank at the shore end was about six inches above the level of the dock, thereby creating a step from the gangplank to the dock; and that as libelant reached the lower end of the gangplank, being unaware of the step and having no warning, she fell from the end of the gangplank and was violently and forcibly thrown forward upon the dock so as to cause her injuries.

Libelant filed a libel in admiralty against the steamship. The trial court sustained an exception to the libel upon the ground that the case was not within the admiralty jurisdiction. The circuit court of appeals affirmed the action of the trial court (73 F. (2d) 170), but the Supreme Court of the United States reversed the action of the lower court, and in holding that the libel presented a case within the jurisdiction of admiralty, said:

"This is one of the border cases involving the close distinctions which from time to time are necessary in applying the principles governing the admiralty jurisdiction. That jurisdiction in cases of tort depends upon the locality of the injury. It does not extend to injuries caused by a vessel to persons or property on the land. Where the cause of action arises upon the land, the state law is applicable.

"The basic fact in the instant case is that the gangplank was a part of the vessel. It was a part of the vessel's equipment which was placed in position to enable a passenger to reach the shore. It was no less a part of the vessel because in its extension to the dock it projected over the land. . . . We perceive no basis for a sound distinction because her fall was due to negligence in the construction or placing of the gangplank. By reason of that neglect, as the libel alleges, she fell from the plank and was violently thrown forward upon the dock. Neither the short distance that she fell nor the fact that she fell on the dock and not in the water, alters the nature of the cause of action which arose from the breach of duty owing to her while she was still on the ship and using its facilities for disembarking." (295 U. S. 1. c. 651 et seq.)

This case has been strengthened and the principle there announced illustrated in the *Shangho* case, 88 F. (2d) 42, and the case of the *Berwindglen,* 14 Fed. Supp. 992.

In the *Admiral Peoples* case, *supra,* the court speaking through Mr. Chief Justice Hughes said among other things, ''The basic fact in the instant case, is that the gangplank was a part of the vessel.'' It follows that any injury occurring on the vessel or any part thereof, so long as said vessel is upon navigable waters, is governed by maritime jurisdiction. It seems to us that it follows with equal force that any injury occurring on the land, or any part of the land, is without the maritime jurisdiction, and in a case such as the case before us is governed by the Federal Employers' Liability Act and the Federal Safety Appliance Act. We do not think this can be gainsaid as a matter of common sense, and besides there are decisions supporting it.

This brings us to the important question to be decided in this case. In the *Admiral Peoples* case the instrumentality was a gangplank attached to the ship; in the case at bar the instrumentality was an apparatus attached to, and, therefore, a part of the land. It necessarily must be so. The shore is the land. A dock is a part of the land; an extension of the dock, however far out, is still a part of the land. A permanent pier is still a part of the land; the fact that the water flows under the pier does not change or alter the situation. The instrumentality employed by appellant for loading and unloading its cars seems to us to be best illustrated by comparison with a pier. The fact that it moves up and down and joins the ship under the circumstances that it does join the ship, does not change that situation. If a pier is a part of the land, appellant's instrumentality was also a part of the land. This instrumentality consisted of a cradle and apron. Plaintiff's intestate received his injuries from an alleged defective appliance while he literally was upon this apron. This apron was a part of the land. The car upon which plaintiff's intestate was riding was partly on the apron and partly on the boat, or partly

on the water and partly on the land. Plaintiff's intestate was on that end of the car which was on the land. The witness Hulsey was on the end which was upon the water. It is urged that this car was an entity, and no distinction may be made between the location of the two parties. We cannot agree with that contention. It might also be urged that the train was an entity and that the injured was on a car which was on the land and the other party was on a car that was on the water. The place of a tort must govern. If it may be argued that plaintiff's intestate was on a car which was an entity, and, therefore, under the circumstances the case is subject to maritime jurisdiction, it could be argued with equal force that had the witness Hulsey been injured, his injury would be governed by the Federal Employers' Liability Act, because part of the car on which he was riding was on the land. The conclusion seems inescapable to us that the place of the tort,—that is, where plaintiff's intestate received his injuries, was on the land.

Complaint is made of the refusal of instructions 1 to 12 of appellant. We cannot see how these instructions should have been given. Under the above facts as a matter of law, the tort occurred upon the land. We are unable to see how the giving of the instructions having to do with maritime jurisdiction had any place in this lawsuit.

The instruction for appellee of which appellant complains is a familiar and regular instruction given in such cases, and it is not an unusual thing for the court to misread an instruction and find it necessary to correct itself. In that event it is usually the better practice to read the whole instruction over than try to correct it in the middle. In the instant case an important part of the instruction was left out and it was called to the court's attention by appellee. It was then inserted and reread. We do not think that the reference

there to negligence is subject to the criticism urged against it,—that is, that it told the jury that the defendant was guilty of negligence.

Complaint is made of the refusal to give appellant's fifth refused instruction. That instruction is as follows:

"The Court instructs the jury that the burden of proof is not upon defendant to show that he was not guilty of the specific negligence charged, but the burden is upon the plaintiff to prove that the defendant was guilty thereof, and this rule as to the burden of proof is binding in law and must govern the jury in deciding this case. The jury have no right to disregard said rule or to adopt any other in lieu thereof, but in considering the evidence and coming to a verdict, the jury should adhere strictly to said rule."

The vice of this instruction in this class of cases is that it requires plaintiff to prove by the greater weight of the evidence that the defendant was guilty of negligence whereas the law is unquestionably that whether the defective condition is due to defendant's negligence is immaterial since the statute imposes an absolute duty upon the company to maintain its appliance in secure condition. (*Texas & Pacific R. Co. v. Rigsby,* 241 U. S. 33.) If the equipment was in fact defective or out of repair and plaintiff's intestate was injured thereby, it is not incumbent upon the plaintiff to prove that such defect was the result of appellant's negligence. We think the court did not err in refusing to give said instruction; and we think the same rules apply to the criticism of plaintiff's instruction No. 1, which is as follows:

"The Court instructs the jury that under the law it was the positive, absolute, and unqualified duty of the defendant to have the car upon which Robert M. Stott was working, equipped with a secure side ladder, and a failure to have said car so equipped, if you do so

find, from the preponderance, or greater weight of the evidence, was a violation of the defendant's duty under the law. And you are further instructed that there is no question of negligence in this case on the part of the defendant or contributory negligence on the part of the said Robert M. Stott.'' This instruction stated a correct principle of law as shown by the foregoing quotation from *Texas & Pacific R. Co. v. Rigsby*, 241 U. S. 33, and also *Spokane & I. E. R. Co. v. Campbell*, 241 U. S. 497.

Complaint is made that the verdict is excessive and the parties hereto have submitted calculations both for and against that contention. On the basis of these calculations we would not be inclined to disturb this verdict on that account even if we had the power to do so, which in our judgment we have not for the reason that in cases arising under the Federal Employers' Liability Act those cases must be settled according to the general principles of law administered in the Federal Courts. In *Chesapeake & Ohio R. Co. v. Kelly*, 241 U. S. 485, the Supreme Court of the United States said, ''the question of the proper measure of damages is inseparably connected with the right of action, and in cases arising under the Federal Employers' Liability Act, it must be settled according to the general principles of law as administered in the Federal Courts''; and in Federal Courts the question of whether a verdict is excessive is not for a court of appeals. In *New York L. E. & W. R. Co. v. Winter*, 143 U. S. 60, the court said,

''Whether the verdict was excessive is not our province to determine. . . . The correction of that error, if there were any, lay with the court below upon a motion for a new trial, the granting or refusal of which is not assignable for error here. As was stated by us in *Actna Life Insurance Co. v. Ward*, 140 U. S. 76: 'It may be that, if we were to usurp the functions of

the jury, and determine the weight to be given to the evidence, we might arrive at a different conclusion. But that is not our province. . . . In such a case we are confined to the consideration of exceptions, taken at the trial, to the admission or rejection of evidence, and to the charge of the court and its refusals to charge. We have no concern with questions of fact, or the weight to be given to the evidence which was properly admitted.' ''

The question, therefore, of the amount of damages awarded by the jury is not for our consideration.

We are of the opinion that the city court properly retained jurisdiction of this case, and that that jurisdiction was settled under the facts as a matter of law. This, of course, is the important question in this lawsuit. In the matter of instructions we are of the opinion that the trial court did not err, either in the giving or refusal of instructions.

The judgment of the city court is affirmed.

*Judgment affirmed.*