## JACOBS v. READING CO.
### No. 7883.

Circuit Court of Appeals, Third Circuit.

Argued March 6, 1942.

Decided Aug. 21, 1942.

---

George Gildea, of Trenton, N. J. (Katzenbach, Gildea & Rudner, of Trenton, N. J., on the brief), for appellant.

William Paul Allen, of New York City (John J. Corcoran, Jr., of Jersey City, N. J., on the brief), for appellee.

Before BIGGS, CLARK, and JONES, Circuit Judges.

BIGGS, Circuit Judge.

Anthony C. Jacobs brought an action pursuant to the provisions of the Employers' Liability Act, as amended, 53 Stat. 1404, 45 U.S.C.A. §§ 51–60, to recover damages for injuries which he received during the course of his employment by the Reading Company as a brakeman at the Wayne Junction Yard of the Reading Company on December 12, 1939.

The accident happened as follows. The railroad crew, of which Jacobs was a member, with a small deisel-electric engine took charge of eight cars at a station of the Reading Company. These cars were to be delivered to the Port Liberty Yard at a point opposite a tower at Wayne Junction. Jacobs, the engineer, the fireman and the conductor all rode in the cab of the engine. Jacobs had almost completed his tour of duty. When the engine with the train got to a point between 500 and 1,000 feet south of the tower at Wayne Junction, Jacobs and the conductor walked out of the cab of the engine to steps on opposite sides of the engine in order to get off the train. The engineer saw them do this. The train was approaching a point where it was the conductor's duty and custom to leave it and put through an official telephone call. The speed of the train was moderate. The time was about 10:30 o'clock in the evening.

Jacobs testified that he descended the steps on the left hand side of the engine. He had his lunch box and lantern in his hand. At the bottom step he about-faced, grasping as he did so the forward grabiron with his left hand and the rear grabiron with his right. Putting himself in a position to get off, he let go with his left hand. Then he saw some object a few feet ahead. He pulled himself back in an attempt to avoid hitting it. The speed of the train was suddenly accelerated. Jacobs' feet slipped. He screamed. He could not grasp the grab-iron again with his left hand though he tried to do so. The object hit him. He testified that the speed of the train threw him into a position where he could not save himself. He lost his hold and fell beneath the cars.

The conductor saw Jacobs fall. He cried out and gave the engineer a stop signal. The engineer applied the brakes in emergency. Aside from a conflict as to the speeding up of the train, the foregoing account of the facts is not in serious dispute. The real conflict between the parties is with respect to the existence of certain customs in the Wayne Junction Yard and upon this run.

The plaintiff had been on the run eleven or twelve days. He testified that he "got off every night in the vicinity, just in where, right in around the vicinity where the two cars, the northbound and southbound tracks are located". He asserted that he always got off on the left hand side of the engine. The engineer denied that Jacobs left the train at this place every night but admitted that he had seen him leave the cab that night and that upon other nights he had noticed that Jacobs was not in the cab at the completion of the run. Jacobs also testified that there was no need for him to tell the engineer or fireman when he was about to get off "for the simple reason that they are just as familiar with the work as I am". He also said that at night when alighting from the train it was the practice to give a go-ahead signal "or a twirl of the lantern".

The conductor on duty the night of the accident denied any knowledge of this

---

the appellant's argument would be sweeping. He could not be compelled to obey a subpœna to respond for jury duty or be compelled to become a member of a posse comitatus or be required to undertake any other duty which citizens must perform in civil life. Organized society could not function if many persons were permitted to have the privilege of refusing to do their duty as citizens when called upon because of covenants believed by them to have been made with God.

practice. He stated, however, that he did not inform the engineer that he was going to get off the right hand side of the train. He said, "It is understood that I got off on that side." He testified that it was customary for him to leave the train near the point at which Jacobs attempted to alight and that that was why he did not tell the engineer that he was going to get off. The fireman, who sat at the left of the engine, testified that he had been instructed that, if he knew a man was going to get off on his side of the train, it was his duty to watch him and report that he was safely off to the engineer.

The flagman who was on the rear car testified that it was the customary thing for some members of the crew to leave the train near the scene of the accident. He stated that sometimes a signal was given when a man left the moving train. A yardmaster testified that he would not call the giving of such a signal a custom but that he would describe it as a "courtesy".

Testimony was also given by the conductor and by the fireman who had previously been on the run. This conductor stated that it was the duty of the fireman "to look out for signals for the safety of the crew on the left side". The fireman was asked on direct examination the following question, "Did you know of any custom prevailing there that when your train came up one of these middle tracks to go to the Port Liberty Yard that the brakeman would get off on the left side, the head brakeman, and that the fireman would turn around and see if he got off safely?" He replied, "Well, I would always look back to see if anybody was getting off or on." Upon cross-examination he was asked, "And when he got down on the ground while you were moving, he would give you a signal and let you know he was safe?" He answered, "Yes, in a case like that he would."

The learned trial judge refused to direct a verdict for the Reading Company and the jury returned a verdict for Jacobs. The court denied the appellant's motion for a nonsuit and for judgment n.o.v. and entered judgment in Jacobs' favor. The appeal followed.

It has been settled law since the decision of the Supreme Court in Chicago M. & St. P. Ry. v. Coogan, 271 U.S. 472, 474, 46 S.Ct. 564, 70 L.Ed. 1041, that the rights and obligations of the parties to an action arising under the Federal Employers' Liability Act depend upon the terms of that Act and the federal decisional law. This ruling was reiterated in Chesapeake & Ohio Ry. Co. v. Kuhn, 284 U.S. 44, 46, 47, 52 S.Ct. 45, 76 L.Ed. 157. The question of negligence on the part of the Reading Company must be determined not by the decisions of state tribunals ruling on questions of negligence arising under the laws of the states but by the decisions of the federal courts interpreting the Federal Employers' Liability Act.[1] We must therefore determine whether there was sufficient evidence under the federal decisions to go to the jury on the issue of the defendant's negligence. This in turn depends upon whether there was adequate proof of the customs Jacobs relied on. We think that the court below did not err in submitting the case to the jury. There was sufficient evidence of two definite, uniform and known practices or customs in the Wayne Junction Yard and upon this run. McClellan v. Pennsylvania R. Co., 2 Cir., 62 F.2d 61. See, also, O'Neill v. Gray, 2 Cir., 30 F.2d 776, 780, certiorari denied 279 U.S. 865, 49 S.Ct. 480, 73 L.Ed. 1003, and Lehigh Valley R. Co. v. Doktor, 3 Cir., 290 F. 760, 763.

There was proof that some members of the crew operating on this run at about 10:30 in the evening were accustomed to descend from the engine of the train at or

[1] This is true whether the definition of negligence is in issue (see Kansas City Southern R. v. Larsen, 195 Ark. 808, 815, 114 S.W.2d 1081, 1085), or the meaning of assumption of risk (see Pacheco v. N. Y., etc., R. R., 2 Cir., 15 F.2d 467, 468) or the weight of evidence. Southern R. R. v. Melton, 240 Ala. 244, 198 So. 588. See, also, the decision of the Supreme Court in Jenkins v. Kurn, 313 U.S. 256, 61 S.Ct. 934, 85 L.Ed. 1316; Willis v. Pennsylvania R. Co., 2 Cir., 122 F.2d 248, 250. Compare Armit v. Loveland, 3 Cir., 115 F.2d 308, 313; United States Fidelity & Guaranty Co. v. Koch, 3 Cir., 102 F.2d 288, 293, and the very interesting opinion of Judge Magruder in O'Brien v. Western Union Telegraph Co., 1 Cir., 113 F.2d 539, 540, arising under the Communications Act of 1934, 48 Stat. 1064, 47 U.S.C.A. §§ 35, 151 et seq. Stott v. Thompson, 294 Ill.App. 450, 14 N.E.2d 246, 254, certiorari denied 305 U.S. 639, 59 S.Ct. 106, 83 L.Ed. 411; Hosman v. Southern Pacific Co., 28 Cal.App.2d 621, 83 P.2d 88, 90, certiorari denied 306 U.S. 656; Smith v. Schumacker, 30 Cal.App.2d 251, 85 P.2d 967, 972, certiorari denied 307 U.S. 646, 59 S.Ct. 1046, 83 L.Ed. 1526.

about the particular point where Jacobs attempted to descend and that the engineer was accustomed to so govern the speed of the train that these members of the crew could descend from the engine in safety. There was also sufficient evidence to go to the jury to prove the existence of a custom that when members of this crew descended from the engine they would give a lantern signal to indicate to the engineer or fireman that they had reached the ground in safety. There was adequate proof that it was the custom for the engineer not to accelerate the speed of the train until he or the fireman had received such a signal.

 If Jacobs' testimony be accepted as truth, the engineer acted negligently in accelerating the speed of the train before he or his fireman had received a signal from Jacobs, in his usual manner, indicating that he had descended in safety. The issue of the credibility of the witnesses was for the jury. Obviously the jury believed Jacobs. That determination may not be set aside.

We have examined carefully the charge by the learned trial judge to the jury. We can see no error in it.

Accordingly, the judgment is affirmed.

CLARK, Circuit Judge, took no part in the decision of this case.