JAMES WHEELER v. MISSOURI PACIFIC RAILROAD COMPANY, Appellant.
—18 S. W. 2d) 494.

Division Two, March 2, 1929.

272

Thomas J. Cole and Harry R. Stocker for appellant.

*Douglass & Inman* for respondent.

274

[black redaction bars]

HENWOOD, C.—This is an action for damages under the Federal Employers' Liability Act, in which James Wheeler, plaintiff below, obtained a verdict in the sum of $15,000 for personal injuries suffered by him while employed by the defendant railroad company. Plaintiff complied with an order of *remittitur*, by which his award of damages was reduced to $12,000, and defendant's appeal from the judgment entered for that amount brings the case here for review.

Under the pleadings, it is admitted that, at the time in question, plaintiff was employed by defendant in interstate commerce. As to the item of negligence upon which the case was submitted, plaintiff alleges in his petition that, while he and two of his co-employees were engaged in moving a large iron wheel on defendant's freight platform, "one of the men assisting to move said wheel negligently turned it loose and failed to support it, thereby causing it to fall on plaintiff and injuring him." In its answer, defendant denies negligence on its part, and further pleads assumption of risk and contributory negligence on the part of plaintiff. The reply is a general denial of the affirmative allegations contained in the answer.

According to the testimony of plaintiff (a Negro), he was about twenty-one years old, at the time of his injuries, and had been employed by defendant for about eleven months. During the last six months of that employment, he had worked on one of defendant's freight platforms in St. Louis. There were three other men in his gang, Jones and Williams (Negroes), and Doyle, also known as Swenk (a white man), and the gang worked under his orders on the day in question. On the afternoon of August 25, 1923, defendant's foreman, Proesig, told him to take his gang and load two pianos in a freight car on the west side of the platform. These pianos were in piano boxes on the east side of the platform and were destined to Dupo, Illinois. Plaintiff sent Jones for a "dolly," which he intended to use in loading the pianos, and he and Williams and Doyle went to the east side of the platform, where they found a large iron wheel leaning against one of the piano boxes. This wheel was about five feet and four or five inches in diameter, with a smooth rim about six or eight inches in width, and weighed about 1,000 pounds. The lower part of the wheel was resting on the platform, about three feet from the piano box. The platform slanted toward the west, and was rough and uneven. While they were engaged in moving it,

"Doyle turned loose the wheel," and it fell on plaintiff. Plaintiff was standing near the center of the wheel, facing north, holding it "somewhere about the hub." Williams was on the east side, facing west, and Doyle on the west side, facing east. Plaintiff used a book in illustrating the position of the wheel and the manner in which they undertook to move it. In this connection, he was interrogated at length; in part, as follows:

### DIRECT EXAMINATION.

"Q. Where were you going to move this wheel to? A. We were going to lean it up against a post.

"Q. Where was that post with reference to the piano box? A. The post was sitting just west of the piano.

"Q. About how far? A. Well, I don't know, sir; I believe it was about six or eight feet.

"Q. Did you take hold of it to move it? A. I told the men we would have to move it, the wheel, in order to load the piano, so I asked them to 'come on, let's move it.'

"Q. Now, just state what you did then. A. . . . The wheel was leaning kind of on the corner of the piano and I got in the center and we lifted the wheel, see, and then we were going to pull the wheel over, and this man Doyle turned the wheel loose and it fell on me.

"Q. Now, can you show us just about how this wheel was leaning up against the piano by taking this book and illustrating with the corner of this as being the corner of the piano box? A. Yes, sir.

"Q. All right. A. About like that. [Witness takes book and illustrates position of wheel.]

"Q. Now, just show us—when it was in this position you say the post was over here? A. Yes, sir.

"Q. Where was Williams, the colored man? A. He was over here.

"Q. Where were you? A. I was here.

"Q. You were about there? A. Yes, sir.

"Q. Where was Doyle? A. Down in the front.

"Q. In the position in which you all had hold of the wheel, what did you then do? A. We raised it up.

"Q. Then what did you do? A. We was going to straighten it around this way (illustrating).

"Q. In what way? A. Like this (illustrating).

"Q. Straighten it around. Where did you say Doyle was? A. On that side.

"Q. On that end? A. Yes, sir.

"Q. Did you notice just where he was and what he was doing when he turned loose of it? A. Yes, sir.

"Q. What was he doing? A. When we were straightening the (wheel) up, we pushed it up to the piano so it would be standing

about so, and we had turned the wheel around and he let go of the wheel to walk around to the front part of the wheel and it fell on me.

"Q. Then it was that you say Doyle moved from the position on the side like around to the front? A. Yes, sir.

"Q. I will ask you whether or not that is the time he turned loose of the wheel? A. Yes, sir."

CROSS-EXAMINATION.

"Q. It was standing so that the top part of the rim leaned against the box and the bottom part of the rim was out from the box? A. Yes, sir.

"Q. About how far would you say the bottom part of the rim was out from the box? A. I don't know, sir; about three feet, I guess.

"Q. You think it was leaning at that much of an angle? A. Yes, sir.

"Q. What I am trying to get at is this: Suppose this part here would be the rim of the wheel towards (Doyle), he standing here facing east. Was he standing right out in front of it facing that way (indicating) or around on the same side that you were? A. He was just a bit to the side that I was.

"Q. Just a little bit towards the side that you were? A. Yes, sir.

"Q. And then in that position all three of you took hold of this wheel to straighten it up? A. Yes, sir; to straighten the wheel up.

"Q. So it rested on the floor straight up and down? A. Yes, sir.

"Q. And at that time you say he turned or moved, did he? A. Yes, sir.

"Q. Which way did he move, around in front of the wheel? A. Around in front of the wheel.

"Q. That is, he came around so he was directly in front of the path of the wheel if you had rolled it; is that right? A. Yes, sir.

"Q. And as he did that you say he let loose of the wheel? A. Yes, sir.

"Q. And then the wheel fell over? A. Yes, sir.

"Q. Which way did it fall? A. Fell south.

"Q. Did Williams have hold of the wheel after it started to fall, or at the time it started to fall?

"Q. He had hold of it at the east side? A. Yes, sir."

Concerning his injuries, plaintiff testified that the wheel fell on his right leg, between his knee and hip, and "broke" his leg. He was taken to defendant's hospital, where he remained for about seven and one-half months, and his treatments at the hospital continued for six weeks thereafter. While in the hospital, several operations were performed on his injured leg, and steel plates were attached to the bone for the purpose of straightening and reuniting the broken parts thereof. At first, his leg was bandaged and placed in a wire basket. Later, it was kept in plaster casts for several

months. He used crutches for about four weeks after leaving the hospital, and, after that, used a cane. He suffered intense pain throughout his confinement in the hospital, and still continued to suffer some pain, when walking on his injured leg, at the time of the trial, in March, 1925. And, at the time of the trial, he was still wearing a steel brace, laced along and over the broken parts of the bone, and held in place by means of an attachment on his shoe and a belt around his waist. When injured, he was earning $100 per month. He was unable to work again until February, 1925, when he was employed as an elevator operator at a salary of $50 per month.

It appears from the testimony of physicians, who treated plaintiff after he left the hospital, that the fractured parts of the thigh bone, or femur, had never formed a good alignment, nor become properly united. "There was a fibrous union; it wasn't a bony union. The leg was swollen from this point down to the foot; the knee was about half normal in motion, and the limitation of motion at the ankle was somewhat in evidence." The fractured parts of the bone overlapped and "bowed out" of line, causing the leg to be shortened an inch and a half or two inches. "The bowing of the leg, that dished position there, will remain permanent."

On behalf of defendant, Proesig, its foreman, testified that he directed plaintiff and his gang to move the pianos, but, at that time, he did not know about the iron wheel leaning against one of the piano boxes. On cross-examination, he said: "It was a fly-wheel, a balance wheel, you might call it, to put on an engine. I guess it would weigh between nine hundred and a thousand pounds."

It was agreed by and between counsel that Frank Swenk, or Doyle, if present, would testify in accordance with a written statement purporting to have been signed by him, which was marked as an exhibit and offered in evidence. This exhibit reads as follows:

"DEFENDANT'S EXHIBIT 1.

"St. Louis, Sept. 13, 1923.

"Statement of Frank Swenk, 310 Convent St., relative to injury to Jos. Wheeler Aug. 25, 1923.

"At the time Wheeler was injured I had been looking for the 'dolly' on platform and had got back within about four feet of where Wheeler had hold of the wheel alone and had started to roll it when it started to fall to one side towards him and he was leaning against it to prevent it from falling and it overpowered him and fell on him. I hurried to try to get to the wheel when I saw it was falling towards him, but it fell on him before I could reach it. It was a wheel about six feet in diameter and would weigh about 1,000 pounds, and was leaning against a piano. It is customary in handling a heavy casting like that to get the 'dolly,' and Wheeler told me to look for a dolly at the time before we started to move the wheel and I began

looking about on platform for it, but I noticed Wheeler went to the wheel and took hold of it and started to move it without anyone helping him and moved it between five and ten feet—just rolled it, and it looked to be a fly wheel off a gas engine and face was only about four inches wide and was difficult to roll, as it would not stand up without holding it. The purpose in moving the wheel was to get it out of the way so we could get the piano. I do not recall where the piano was billed to. Jones, the other man working with myself and Wheeler, had gone to south end of platform in search of a dolly and was not anywhere near when accident occurred. Wheeler did not ask me to assist him and I never knew he was going to try to move the wheel until he took hold of it. We had no checker working with us, and Wheeler himself was directing our work. There was no one except myself and Wheeler present. I have read this statement and it is true.

MR. FRANK SWENK.

"Attest:
"G. F. STAYTON."

I. We do not agree with learned counsel in the contention that plaintiff failed to make a case for the jury on the issue of defendant's negligence. It is admitted that defendant's foreman ordered plaintiff and his gang to move the pianos from the platform into a car, and it must be conceded that it was necessary to move the wheel away from one of the pianos before it (the piano) could be moved. Plaintiff's testimony leaves no room for uncertainty or speculation as to what caused the wheel to fall, and the injuries to plaintiff resulting therefrom; that is, the fact that one of plaintiff's co-employees, Doyle, "turned the wheel loose," or released his hold on the wheel, while he and plaintiff and Williams were engaged in raising it or placing it in a position which would enable them to roll it or move it to the post, six or eight feet west of the piano. Considering the size and weight of the wheel, the difficulty of handling it, and plaintiff's position (near the center of the wheel) at the time, it was for the jury to say whether or not Doyle exercised ordinary care in releasing his hold on the wheel, and the jury were fully warranted in finding that Doyle was negligent in so doing, under such circumstances. [Karagas v. Railroad (Mo. App.), 232 S. W. 1100.] The cases relied on by defendant are readily distinguishable on the facts, and, therefore, have no application in this case. It follows that the demurrers to the evidence were properly overruled.

II. Defendant challenges plaintiff's instruction numbered 8, which is in the following form:

"The defendant alleges in its answer that plaintiff was guilty of carelessness and negligence in the manner or method of handling the wheel, and in failing to place himself in a position where he could by the exercise of ordinary care have avoided being struck by the wheel, but the court instructs you in this connection that before you can deny plaintiff a recovery on these grounds, that the burden is on the defendant to prove to your reasonable satisfaction by the greater weight or preponderance of the evidence that plaintiff was guilty of one of said acts, and that such act was a negligent act on the part of plaintiff, *and that it was the sole cause of plaintiff being injured, if injured.*" (Our italics.)

It is true, as counsel contend, that this instruction was erroneous in declaring that the burden was upon defendant to prove that plaintiff's negligence was the *sole cause* of his injuries. But, in effect, the instruction did properly advise the jury that the burden was upon defendant to prove its defense of contributory negligence, and that, even though they found plaintiff guilty of contributory negligence, he could not be denied a recovery on that ground. In plaintiff's instruction numbered 1, and also in defendant's Instruction No. 7, it was made perfectly clear to the jury that, in order for the plaintiff to recover, they were required to find that his co-employee, Doyle, was *negligent* in releasing his hold on the wheel. In defendant's Instruction No. 6-A, the jury were told that "the burden is imposed upon him (plaintiff) by law to establish, by the preponderance or greater weight of the evidence that his injury was the direct result of the *negligence of defendant* in some one or more of the respects alleged in his petition." And, in plaintiff's Instruction No. 9, the jury were properly advised as to the rule of comparative negligence, and as to the proper method of measuring plaintiff's damages in accordance therewith. Plaintiff's Instruction No. 8 merely called attention to the defense of contributory negligence and did not authorize a verdict upon any finding whatsoever. When considered in connection with other instructions, relating to the main issues in the case, we do not think that the jury were misled by this instruction, nor that defendant was prejudiced thereby. See this court's ruling upon similar instruction in Rigley v. Prior, 233 S. W. 828, 831.

III. Defendant further complains of certain remarks made by plaintiff's counsel in his argument to the jury. In his opening address to the jury, counsel for plaintiff said: "I think, gentlemen, that the reason this statement was read is that they didn't want to produce this man Swenk and subject him to cross-examination." It is said that such remarks were improper because plaintiff's counsel agreed that, if present at the trial, Swenk would testify to the facts contained in the statement purporting to

have been signed by him, and that no comment would be made in the argument concerning the failure of Swenk to testify. The agreement that Swenk, if present, would testify to certain facts did not deprive plaintiff's counsel of the right to comment upon his failure to testify, and, in our opinion, the record does not show that plaintiff's counsel waived that right. Defendant also objected when plaintiff's counsel, in his closing argument, read to the jury a portion of defendant's answer, in replying to the argument of defendant's counsel as to the "fairness" displayed by the parties to the suit. As we read and understand the record, plaintiff's counsel was entirely within his rights in making the remarks complained of, in each instance, and the objections thereto were properly overruled.

IV. Finally, it is claimed, though not seriously urged, that the judgment of $12,000 is excessive, and that the verdict was the result of passion and prejudice on the part of the jury. We find nothing in the record to indicate that the jury were influenced by improper motives, and, considering plaintiff's age, the nature and extent of his injuries, the pain suffered by him in connection therewith, and the impairment of his earning capacity, we do not feel justified in saying that the judgment is excessive. In Zumwalt v. Railroad, 266 S. W. 717, this court upheld a much larger judgment, based upon similar injuries. [See also, our rulings in Ernst v. Ry. Co., 256 S. W. 222; Schlueter v. Ry. Co., 296 S. W. 105.]

In accordance with the conclusions above stated, the judgment is affirmed. *Higbee* and *Davis, CC.*, concur.

PER CURIAM:—The foregoing opinion by HENWOOD, C., is adopted as the opinion of the court. All of the judges concur.