18 So.2d 737

**ALABAMA GREAT SOUTHERN R. CO. v. DAVIS.**

6 Div. 191.

Supreme Court of Alabama.

June 22, 1944.

Rehearing Denied July 25, 1944.

Benners, Burr, Stokely & McKamy, of Birmingham, for appellant.

Jackson, Rives & Pettus, of Birmingham, for appellee.

FOSTER, Justice.

The question on this appeal is whether there was sufficient evidence of negligence of appellant or any of its employees which proximately caused the death of plaintiff's intestate (Davis) under the Employers' Liability Act of Congress. `45 U.S.C.A. § 51 et seq. That question does not involve contributory negligence by decedent. If there was sufficient evidence of appellant's negligence, decedent's contributory negligence would be material for certain purposes. But decedent's conduct on that occasion is material to determine whether appellant or its employees were negligent proximately causing his death.

Davis, the decedent, was what was termed head brakeman on a freight train. That meant that his principal duties were toward the front end of the train. The swing brakeman was toward the back end, and the flagman protected the back end and coupled and switched as needed. The conductor had control of the train. The engineer obeyed his directions and observed signals.

The train was on a trip north toward Birmingham from Bessemer on the east main of a double track, and passed Phoenixville, a station near a cement plant which was north of it and west of the railroad tracks of appellant. The west main was used for the southbound travel which we will call the south main, and the east for north travel, which we will call the north main. The train had switching to do at the plant. To get into the plant from the east or north main line, the train had to travel north from Phoenixville to and over a crossover track from the north to the south main, and down it to a lead track from it to the plant yard. That plant was also served by the Atlanta, Birmingham and Coast Railroad Company whose line was west of the plant and whose engine and crew were at that time switching in its yard, so that appellant's engine and crew had to wait until the service was finished. That was at night. Appellant could not get this entire train of twenty-

three cars on it. So that in waiting to get into the cement yard, the train had to wait on the southbound track or the northbound track, as was most convenient. The conductor directed the procedure. He caused the train to pass along the cross-over track to the southbound track and back down that track. That made it the duty of Davis, the decedent, to go forward toward Birmingham, and protect the front from southbound travel. This he did. After waiting three-quarters or an hour a special southbound freight came down. It had been flagged by decedent and he rode down on the engine. The conductor then arranged to move his train to the north track, out of the way. But before doing so discovered a train coming from the south, going north on that track. So he waited for the train to pass. Then decedent lined up the switch on the northbound track for the cross-over, and Atkinson, the swing brakeman, lined it up on the southbound track for the cross-over. The train then made the movement over to the northbound track and passed the switch with its caboose. Then decedent lined up the cross-over switch with the northbound main and crossed that main behind the caboose, and at the same time Atkinson lined it up for the southbound main, and crossed over also and went down the side path nine or ten car lengths (forty feet each) to where the conductor Cagle was standing. The southbound freight was then moving slowly in its course. Atkinson then asked Cagle what he planned to do. He told Atkinson that he would back down on the northbound track and wait. Another train would be due down the southbound track in about an hour. All the trainmen had a time-table showing that schedule. Atkinson then gave with his lantern a little back up signal to decedent and hallooed to him. This was done two or three times. This signal was intended for Davis, whose lantern showed from the side of the northbound track at the switch which was his post of duty.

Davis would ordinarily relay it to the engineer. It is not clear exactly where he was standing. As to that, Cagle testified as follows: "When I noticed Mr. Davis, I saw him go across the switch behind the caboose on the east side. That is the last time I noticed him. As to whether that was his post of duty there on the engineer's side, as we had gotten our train off the south main, he had no reason for being out flagging. His post of duty was there by the switch. The signals were given from the engineer's side. * * * the last time I saw him was when he lined the switch and walked across behind his caboose, if it was him that lined the switch and I suppose it was." And Atkinson testified as follows: "Yes, I saw him walk across. The cabooses have lights on both sides of the back end, known as markers. They are kerosene lamps. I was walking in that litle path along by the side of the track as I left Mr. Cagle and started up this way, and I saw that lantern there at that time. It was on the same side of the caboose that I was on, but from just looking I couldn't tell whether he was standing on the track or not. It looked like he was on this side of the track, just looking straight up. When we pass the back up signal, or any kind of signal, every man in the crew does not necessarily have to pass that signal. As to whether under those conditions Davis was supposed to acknowledge my signal, I was passing my signal to Davis, but after the engineer blew three times, I turned around and started walking on back, because that was from the engineer that he got my signal, and three blasts from him was a back up signal. That meant he was going to back up, but I was giving my signal to J. B. Davis." There was no other evidence of his exact position.

After Atkinson gave this little back up signal two or three times, the engineer gave three short blasts of his whistle. This was his back up signal. It was heard and understood by Atkinson and Cagle about thirty-three car lengths away, and by Barnes, the flagman, about forty-five to fifty car lengths away; whereas Davis was only about twenty-three car lengths away. Atkinson hearing it turned his back and walked away from the direction of Davis toward Cagle. Davis did not acknowledge the signal. The train soon began to back and soon afterwards Davis began to halloo, and Atkinson gave the "wash out" signal, for an immediate stop. He gave it also to the south-bound train and stopped it. They went to Davis and found him sitting on the edge of the cross-ties with both legs cut off. The caboose and two coal cars had passed. He was sent in ambulance to the hospital and died that night.

Appellee claims that Davis was not expecting his train to be backed and parked on the north main, and had heard the con-

versation at Phoenixville that his conductor intended to park it on the south main, but this was always in the discretion of the conductor, dependent upon the respective advantages of each under the particular circumstances.

Atkinson testified that the three short blasts of the whistle was the engineer's back up signal, and the only one he had. That those blasts meant that. That he only heard one such signal from the engineer.

Cagle testified that he did not notice what was the first signal the engineer gave, but that he gave two signals. That the second time he blew a back up signal—three shorts. Also that a call by the engineer for a signal is four shorts. This witness heard two signals, but did not know how many blasts he gave in the first; then he gave three shorts. The witness then testified: "That means backing up. The purpose of giving that signal is to let you know he wants to back up, and he can blow that after he gets a signal, to let you know he is backing up. The purpose of blowing after he gets the signal is to let you know he is backing up, or to let you know he wants to back up; either one. When the back up signal is sounded it does not mean, in all cases, that he is going to back up his train. It might have meant that he had gotten a back up signal and was fixing to obey it, and let the crew know it." "That rule 16c (referring to rule book shown witness) reads: 'When standing, back the train, three shorts,' and that train was standing and when the engineer blew three shorts like I say it means he was going to back the train; it don't mean necessarily he had gotten a signal. It probably meant he was going to back up at that particular time, but that is not always the case. As to whether that is what I understand it to mean at that time, I suppose that is what he meant, calling for the signal that first time."

We here refer to certain established principles of law in connection with this sort of case not in any respect disputed by counsel. This is done only to illustrate the meaning of the issue and what really is controverted.

The gist of this action is negligence of some sort by the railroad company or some employee of it in the scope of his duty, which proximately caused the death of Davis. There is no presumption of negligence. The evidence to sustain the claim must be of a substantial sort; more than a scintilla, and it cannot be predicated on a conjecture, or a supposition that there might have been negligence which proximately caused it. But the inference of negligence must be from a reasonable and fair interpretation of the evidence; and does not follow because it cannot be said that there was no fair inference that Davis was himself negligent, nor evidence showing the circumstances of the accident. The defendant has no burden or duty to overcome any presumption of negligence. If the evidence does not fairly show what was the proximate cause of the accident, plaintiff cannot recover. The cases establishing those principles have often been cited and are fixed by the Act itself as interpreted by the Supreme Court of the United States. Brady v. Southern R. Co., 320 U.S. 476, 64 S.Ct. 232; Tennant v. Peoria & P. U. Ry. Co., 321 U.S. 29, 64 S.Ct. 409. We will cite a few of our more recent cases, which cite other federal cases. Southern R. Co. v. Melton, 240 Ala. 244, 198 So. 588; Southern R. Co. v. Glenn, 228 Ala. 563, 154 So. 792; Atlantic Coast L. R. Co. v. Wetherington, 245 Ala. 313, 16 So.2d 720.

The question is, as we have stated, whether a fair interpretation of those facts, considered in a light most favorable to Davis, justifies a finding that his death was proximately caused by the negligence of the defendant or one of its servants acting in the scope of his authority.

In the several appeals of the case of Mobile & Ohio R. R. Co. v. Williams, 219 Ala. 238, 121 So. 722; Id., 221 Ala. 402, 129 So. 60; Id., 224 Ala. 125, 139 So. 337; Id., 226 Ala. 541, 147 So. 819, we sustained a jury finding of negligence under the Federal Employers' Liability Act when the deceased was engaged in checking cars in a string preparatory to its movement out of the yard. The signal for the engineer was given by the yard foreman at the time in charge of the movement when neither he nor the crewmen, nor anyone else, knew where deceased was and no whistle blast was given. He was run over by the cars and killed. But it was his duty to be about those cars, crossing from one side to the other, which could well have put him in danger from such a movement. We said they owed him a duty to take care of his safety, by finding out where he was. This was since no signal of the whistle or bell was given, and though it was only a con-

jecture as to exactly what deceased was doing and how he got under the cars. But we said that the crewmen should exercise due care to avoid injurious consequences to an employee who in the discharge of his duties is likely on that account to be in a dangerous place,—citing 39 Corpus Juris 458 (sections 574 and 575: see, Mobile & Ohio R. Co. v. Williams, 219 Ala. at page 245, 121 So. at page 747 [7], and 221 Ala. at pages 407 [2 and 3], 408 [5]), 129 So. at pages 64, 65. This is there said to be on the theory that it is the duty of a railroad company to give reasonable warning of the movements of its trains, cars or locomotives, which are liable to endanger employees working in or about them when standing. This theory is supported by the recent case of Tennant v. Peoria & P. U. Ry. Co., 321 U.S. 29, 64 S.Ct. 409.

In the instant case when Atkinson gave the back up signal, it was directed to Davis, the deceased, who was then apparently standing at his post of duty by the track near the switch, where he was not necessarily in danger by reason of such movement, and his duties did not anticipate any such danger or change of position. The engineer probably caught the signal and responded with three short blasts, indicating either that he was backing up or to let them know that he wanted to back up. There was no evidence of impropriety in doing so, nor the violation of any rule. The important circumstance was that the engineer gave the back up signal by his three short blasts, although sometimes he might not have understood such a small signal from that distance. But it is undisputed that his three shorts showed that he had a back up in mind. There is no evidence tending to show that the engineer should not act on the little signal if he caught and understood it and gave his indication of that fact by his three shorts.

The evidence of Cagle relied on by appellee on page 63 of the record is as follows: "As to whether the engineer would have been authorized to move on the signal I saw Mr. Atkinson give, I don't know what he thought about that little bitty signal; it is a question of whether he would want a wider signal."

Rule 84 is also relied on.—"A train must not start until the proper signal is given. A freight train must not pass a station without proceed signal from the conductor." But the engineer gave the proper

and only required back up signal. Whether or not the signal given him was as wide open as is customary when intended for him to act on it, the only question is whether he recognized it as a back up signal and indicated it by his three shorts. The evidence which it is claimed means that the lantern signal by Atkinson was owing to Davis, shown on page 31 of the record, is as follows:

"Q. Let me ask you this, if there is a swing brakeman here (indicating) giving the signal, and a flagman here and a brakeman between the swing brakeman and the engineer, and you are not paying any attention to where this man is, isn't it proper to see that this man knows what the signal is too? A. It might be.

"Q. Would you give a signal for a train to back up if you didn't know where a trainman was—up here around the caboose? A. No, if I had any idea about where he was—

"Q. You wouldn't give any signal? A. No, sir.

"Q. Well, it is important then for the brakeman that would be here near the rear end of the train, around the caboose, to see the signal that was being given from the south? A. Well, he—

"Q. It is just as important for him to know what it is as the engineer?

"Mr. Stokely: Object to that.

"The court: Sustained."

We do not interpret that to mean that any such specific duty was owing Davis on this occasion, if the engineer's back up signal was in performance of his duty as to warning him and all the trainmen of such intended movement, and at a time when Davis was apparently out of danger.

If Davis did not catch the Atkinson lantern signal and his verbal warning, the engineer's back up signal warning of the movement was in all respects sufficient even though no signal had been given him by Davis as to which there is a conflict. No other notice to Davis was required by the rules of the company when he was not in a position of danger from the movement, and the trainmen knew it, and the circumstances did not suggest a change of his position to one of danger which should be noted by the other crewmen. In this respect it is different from Tennant v. Peoria & P. U. Ry. Co., supra, where no warning signal was given.

■■ It is not the duty of the company to show just how he met his death or what he was doing. He could have attempted to catch the moving train and slipped under it. A presumption against his negligence will be indulged. Tennant v. Peoria & P. U. Ry. Co., supra; but the same presumption applies to other trainmen, Atlantic Coast L. R. Co. v. Wetherington, Ala.Sup., 16 So.2d 720 (11).[1] But whether the engineer's three shorts was a back up signal or to indicate he wanted to back up, it was enough to put Davis on notice to look out for a back up, and to stay out of danger, for his duties did not call for him to be in a position of danger.

■ If we assume that Davis had information obtained sometime previously that the train would be parked on the southbound track, and would not therefore back down the northbound track beyond the cross-over switch, he also knew that the operation was under the control of Cagle, the conductor, who could change his plans. And if he did so it was not necessary to hunt up Davis personally and so advise him, if the ordinary signals were given to that end, and they were reasonably sufficient. The lantern signal to that effect was given him several times to relay to the engineer according to custom as well as a hallooing of it by Atkinson, and then the back up signal was given by the engineer who had caught the lantern signal; all at a time when they knew that Davis' duties did not then put him in danger from such a movement, and knew that the engineer, twenty-three cars beyond Davis, had caught the lantern signal. It was a warning to stay out of danger from a back up. If Davis did not catch the signals given by Atkinson, there is no reason to find that the signal given by the engineer was not sufficient warning to him. If Davis did not hear it on account of the noise of the southbound train, the other trainmen had no way of knowing that. This same southbound train was then passing Atkinson and Cagle also, and had the same tendency to obstruct their hearing, but they did hear it. Why should it not be sufficient for Davis?

If Davis put himself on the track behind the train at that time, which we will not assume, he should not have done so after such warnings to him. The engineer's signal was warning to all the trainmen. If he attempted to catch the moving cars and slipped under them, this was not the proximate result of any negligence of the trainmen, so far as the evidence shows. It is difficult to imagine any other cause of his injury.

The only question is whether proper signals were given of the intended movement. Davis was eight or ten car lengths nearer the engineer and to the engine whistle than Cagle and Atkinson, and they heard it with no better opportunity, and no one testified that it was not given in a way well understood by all trainmen. The situation simply shows a regretable incident for which the defendant is not responsible, since its duty to Davis was fully discharged.

The affirmative charge should have been given for the defendant.

Reversed and remanded.

GARDNER, C. J., and THOMAS and STAKELY, JJ., concur.

