50 So.2d 749

**ATLANTIC COAST LINE R. CO. v. GLASS.**

**6 Div. 64.**

Supreme Court of Alabama.
Feb. 15, 1951.

Graham, Bibb, Wingo & Foster, of Birmingham, for appellant.

Taylor, Higgins, Windham & Perdue, of Birmingham, for appellee.

STAKELY, Justice.

This is a suit brought by Percy Glass (appellee) as plaintiff against Atlantic Coast Line Railroad Company, a corporation (appellant), as defendant under the provisions of the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. The complaint contained a single count which in brief claims damages against the defendant on account of injuries alleged to have been sustained by the plaintiff as a proximate result of alleged negligence of the servant, servants, agent, agents, employee or employees of the defendant, acting within the line and scope of his or their employment as such in and about the handling of a railroad rail during the course of plaintiff's employment as a section hand of the defendant in furtherance of interstate commerce engaged in by the defendant as a common carrier of passengers and freight by railroad in Shelby County, Alabama, on December 17, 1947.

There was verdict and judgment in favor of the plaintiff against the defendant. The defendant filed its motion for a new trial which the court overruled.

It is not practicable to set out the evidence in all its detail but the following is a statement in substance of the salient facts in the case. Without dispute the appellant was on the date in question a common carrier of freight and passengers engaged in interstate commerce along and over the section of track upon which the appellee was employed by appellant to work as one of its section hands. Without dispute the track at the time in question was the main line track of appellant extending between Atlanta, Georgia and Birmingham, Alabama along and over which the appellant operated both passenger and freight trains daily. Without dispute it was the duty of the section crew of which appellee was a member to maintain this track in repair. Without dispute at the time and place the appellee received his alleged injury appellee was engaged in the performance of the duties of his employment by the appellant and the other employees of the appellant were likewise engaged in and about the performance of the duties of their employment by appellant.

There were four members of the section crew on duty and participating in the work at the time appellee sustained his alleged injuries. These four were (1) E. O. Watts, the foreman of the crew, (2) Roland Smith, Jr., (3) J. W. (Willie) Gay, and (4) Percy Glass, the appellee. All four of these persons testified as witnesses in the case. Roland Smith, Jr. and appellee testified as witnesses for the plaintiff. E. O. Watts and J. W. (Willie) Gay testified as witnesses for the defendant.

The evidence on behalf of appellee was in substance to the effect that on December 17, 1947, while the three section crew members (Smith, Gay and appellee) were engaged in loading a railroad rail approximately 33 feet long and weighing 800 or 880 lbs. onto a pushcar at a point near Milepost 959, approximately ⅓ mile south of the tool house, one of the three (Smith) let off or laid down the weight of the rail which he was carrying without giving warning that he was about to do so and then the feet of the other member (Gay) slipped in the loose slag of the roadbed and as a result practically all of the weight of the rail was thrown upon appellee, injuring him. E. O. Watts, the foreman, was not actually helping to lift the rail at the time. Smith, Gay and appellee were the ones actually doing the lifting. The rail being lifted had been lying on the left side of the track facing north. In lifting the rail appellee was on the north end of the rail, Gay was next to appellee and Smith was next to Gay. The rail was lying some 6 or 8 feet from the railroad track and the track was up on a bed with the rail down below the bed. The pushcar onto which the rail was being lifted was on the track and the pushcar was about 2 feet or a little better higher. The bed upon which the track was laid was about 18 inches or 2 feet higher than where the rail lay. The three men lifting the rail took positions along the left side of the rail facing north.

As they lifted and started around with the rail, their purpose was to place the middle of the rail on the pushcar so that they could bring the other end around.

When the incident occurred which threw all of the weight practically on the appellee, E. O. Watts, the foreman, got a lining bar and stuck it under the end of the rail. Smith heard the appellee tell Watts that he (appellee) had hurt his back. It was after this statement that Watts got the lining bar and stuck it under the end of the rail. This took some of the weight off the appellee at the end of the rail and they were able to get the rail on the car with this assistance from Watts. After the rail was loaded on the car it was taken to the tool house where it was unloaded. Shortly after this the men knocked off from work. At the tool house Smith heard appellee again tell E. O. Watts that he (appellee) had hurt his back. Before appellee had hurt his back on this occasion, appellee was a good worker and did his part of the work. After appellee hurt his back appellee worked only about 4 or 5 days. Appellee was complaining with his back and limping. Shortly thereafter appellee was made acting foreman.

Without dispute the manner of loading the rail with three men picking up the end was the usual and customary manner of performing that necessary part of the job. E. O. Watts denied that there was any such occurrence with reference to the rail as testified to by the plaintiff and the witness Smith. He denied that the plaintiff was hurt on the occasion as claimed by him or that the plaintiff had told him that he was hurt. The witness Watts produced the original records made by him of the work done by the section crew under his direction during the entire month of December up to December 24, 1947. From these records and from his recollection he testified that while rails had been removed from the track and laid alongside it during the middle part of December and including December 17, 1947, neither Glass nor any of the crew loaded any rails on a pushcar except one rail which was loaded around the first of December, 1947, and this was done completely without incident of any kind.

The testimony of J. W. (Willie) Gay tended to corroborate the testimony of the foreman, but in part he testified as follows:

"Q. Do you remember any occasion during the month of December, 1947, when you and Mr. Glass and Roland Smith were loading any rail on a push car? A. Yes, sir.

"Q. Was that a rail that had been taken out of the track? A. Yes, sir; the rail had been taken out.

"Q. On that occasion did either you or Mr. Roland Smith lose your footing or drop the weight of the rail? A. Not as I remember. Nobody never lost any footing.

"Q. Did you hear Mr. Glass at the time say anything about hurting his back? A. Sure didn't.

"Q. Did he hurt his back on any such occasion during December, 1947, working with you? A. If he did, I didn't know anything about it.

"Q. During December, 1947, and prior to the—before the time when you say you were loading this rail with Mr. Glass and Roland Smith, had you or not heard Mr. Glass complain about any pain in his back or legs? A. Nothing, only after this happened he did.

"Q. Did he say anything about having—what did he say he had? A. Well, he said,—in other words, Mr. Glass told me that Doctor Hines—he had went down to see Doctor Hines and he had told him he had rheumatism.

"Q. That was a long time after this rail loading, wasn't it?

"Mr. Perdue: Wait a minute, don't lead him. Let him testify. He is 21 years old.

"Q. Well, was it? A. It wasn't—at the time—after he went to Birmingham see. Of course, shortly after this rail was handled around there he hobbled some about five or six days after that."

Upon being recalled for further cross examination the witness J. W. (Willie) Gay testified that from the time he first noticed Glass limping on his leg, it happened about 4 or 5 days after he was alleged to have been hurt. Glass continued to complain most of the time with a pain in his leg and

limped. He continued limping until he quit work there and got worse. Glass got down to the point where he couldn't go and was confined to the bed and part of the time to the floor. Glass was so confined around one or two months. He remembered the time when Glass came up to Birmingham and when Glass got back from the doctor there Glass told him the doctor had made an X-ray and found a slipped disc.

On rebuttal the plaintiff Glass testified that he had never been treated for rheumatism before the accident occurred on December 17, 1947 and that so far as he knew he had never had rheumatism and that no doctor had ever told him that he had rheumatism. That he had never before suffered with his back like he had suffered since December 17, 1947.

There is evidence in the record tending to show that the plaintiff had suffered with rheumatism prior to the accident and complained of rheumatism after the accident. F. S. Crosley succeeded Glass as section foreman on January 1, 1948 and R. M. Hayes succeeded Crosley as section foreman on January 20, 1948. J. W. Shannon was the superior road master during all of the time involved in the case. All three testified that the first intimation that any of them ever received about Glass' claim to have been hurt while doing his job was after Glass had laid off with his preexisting rheumatism and that he asked Hayes to put him back to work in July, 1948. At that time Hayes sent Glass to Dr. Waldrop at Bessemer for the necessary examination. That report showed that his back and all of the elements of his physical being were in good shape. At that time for the first time, according to these witnesses and as shown by the report, Glass claimed that his back was injured on January 29, 1948.

On redirect examination Glass testified that he did not tell anybody in Dr. Waldrop's office where the paper was filled out that he had gotten hurt on January 29th. "I did tell him that the first doctor I saw was on December 29th." He testified that the signature on the paper could be his but he wouldn't swear to it.

Tendencies of evidence further show that the plaintiff was treated by several doctors and then on March 19, 1948 was sent to Dr. Sherrill, a recognized orthopedic specialist in Birmingham. Dr. Sherrill did not see or treat him at that time. He was treated by Dr. Ryan in Dr. Sherrill's office. X-rays were made and a steel brace was put on him. Dr. Sherrill examined the plaintiff and the X-rays at the time of the trial. He testified that the X-rays showed a ruptured intervertebral disc with resulting derangement of the spine and that such injury could have happened as a result of the accident as claimed or could have resulted from other causes but that the appellee sustained severe, painful and permanent injuries to his back and in his opinion appellee was not able to work due to the condition which he found in his spine. He testified that the fact that appellee had had no previous trouble with his back and hadn't been hurt since would have a bearing on the matter. He further testified that in his opinion appellee's trouble was not due to arthritis as there was very little evidence of arthritis disclosed by the X-rays.

Reversal of the judgment of the lower court is sought on the grounds (1) the court erred in refusing the affirmative charge requested by the defendant, (2) the court was in error in its ruling on various written charges requested by the defendant and (3) the motion to set aside the judgment and verdict and grant a new trial should have been sustained, because the verdict was contrary to the great weight of the evidence.

It is insisted that under the undisputed testimony the defendant was entitled to the affirmative charge. It is pointed out that there is no presumption of negligence and that the evidence to sustain the claim must be of a substantial sort, more than a scintilla, and cannot be predicated on conjecture or a supposition that there might have been negligence which proximately caused the injuries. Alabama Great Southern R. Co. v. Davis, 246 Ala. 64, 18 So.2d 737. See Reynolds v. Atlantic Coast Line R. Co., 251 Ala. 27, 36 So.2d 102. It is argued that there is no evidence sufficient to meet

the requirements of the foregoing authorities in merely showing that the plaintiff was lifting more than he could and when the witness Smith let off or laid down the weight of the rail which he was carrying without giving warning that he was about to do so and the witness Gay slipped in the loose slag of the roadbed, that these things certainly constituted no negligence on the part of the employer. In other words that the slipping or stumbling by an employee in the course of lifting or carrying objects is a risk or an element inherent in the job to be performed and if dangerous it is completely disassociated from any negligence on the part of the employer and is an ordinary risk to employment which the employee assumes. It is also pointed out in this case that the evidence without dispute shows that the manner in which the rail was being loaded on a pushcar was in keeping with the usual and customary practice, was a necessary job in the course of the work and was one which three men could readily and easily perform.

We think, however, that under all the facts and circumstances in the case the question of negligence vel non was a question for the jury.

In the case of Texas Pipe Line Co. v. Johnson, 169 Ark. 235, 275 S.W. 329, 330, the court, among other things, said: "So in the case at bar the jury was warranted in finding that, in the exercise of due care, Narramore should have warned Johnson before he let go of his end of the carrying iron. The five men were working under a foreman, and were directed by him to carry an iron pipe about 20 feet long and 6 inches in diameter, weighing between 400 and 500 pounds across a small ditch 2½ or 3 feet wide, and of about the same depth. The pipe was lying diagonally across this ditch. The method of work was for two men to carry the front end by placing a carrying iron under it, and two others were to carry the rear end in a similiar way. The plaintiff had the rear end in his arms. He had a right to expect that none of his fellow workmen would drop his end of the carrying iron, and thus let the weight of the pipe fall on him without notice to him. The men were working together, and each had a right to expect that his fellow workman would exercise due care in the premises for the safety of the others."

In the case of Wheeler v. Missouri Pacific R. Co., 322 Mo. 271, 18 S.W.2d 494, 496, the court said: "We do not agree with learned counsel in the contention that plaintiff failed to make a case for the jury on the issue of defendant's negligence. It is admitted that defendant's foreman ordered plaintiff and his gang to move the pianos from the platform into a car, and it must be conceded that it was necessary to move the wheel away from one of the pianos before it (the piano) could be moved. Plaintiff's testimony leaves no room for uncertainty or speculation as to what caused the wheel to fall, and the injuries to plaintiff resulting therefrom; that is, the fact that one of plaintiff's coemployés, Doyle, 'turned the wheel loose.' or released his hold on the wheel, while he and plaintiff and Williams were engaged in raising it or placing it in a position which would enable them to roll it or move it to the post, 6 or 8 feet west of the piano. Considering the size and weight of the wheel, the difficulty of handling it, and plaintiff's position (near the center of the wheel) at the time, it was for the jury to say whether or not Doyle exercised ordinary care in releasing his hold on the wheel, and the jury were fully warranted in finding that Doyle was negligent in so doing, under such circumstances. Karagas v. Union Pac. Railroad Co., Mo.App., 232 S.W. 1100. The cases relied on by defendant are readily distinguishable on the facts, and therefore have no application in this case. It follows that the demurrers to the evidence were properly overruled."

See also Great Western Land Co. v. Barker, 164 Ark. 587, 262 S.W. 650; St. Louis Southwestern Ry. Co. v. Smith, 102 Ark. 562, 145 S.W. 218; Phillips Petroleum Co. v. Jenkins, 190 Ark. 964, 82 S.W. 2d 264; Missouri Pacific R. Co. v. Bryant, 213 Ark. 149, 209 S.W.2d 690; Christie v. Great Northern Ry. Co., 142 Ore. 321, 20 P.2d 377; Hines v. Blackmon, Tex. Com.App., 239 S.W. 908; Steely v. Kurn, 347 Mo. 74, 146 S.W.2d 578.

In many of the foregoing cases the question of assumption of risk by the plaintiff was considered. These cases arose or were tried prior to the 1939 Amendment to the Federal Employers' Liability Act. The Supreme Court of the United States has specifically held that "every vestige of the doctrine of assumption of risk was obliterated" from the Federal Employers' Liability Act by the 1939 Amendment thereto. Tiller v. Atlantic Coast Line R. Co., 318 U.S. 54, 63 S.Ct. 444, 446, 87 L.Ed. 610.

■ Counsel appear to place some importance upon the fact that the evidence showed that the work in question was being done in the usual and customary manner at the time the appellee was injured. Such fact has no bearing upon the liability of appellant for the negligent act of Smith in letting off or dropping the weight of the rail which he had theretofore been lifting without warning to the plaintiff. The fact that the work was being done in the usual and customary manner does not satisfy the duty owed by the master. In the very recent case of Waters v. Anthony, 252 Ala. 244, 40 So.2d 316, 319, this court said: "It is not necessary that he have complete control of the operation of the theater. But if he is performing his duties owing to his master under his contract, it was his duty to use reasonable care in the manner of doing it so as not to cause injury to third persons exercising their lawful rights as patrons of the theater. Wright v. McCord, 205 Ala. 122, 88 So. 150. It was shown by his evidence to be his custom to inspect the seats every Tuesday afternoon and to a certain extent every day. The theater was cleaned by a maid every day, and it was her duty if she found anything wrong with a seat to turn it down. And Lackey's custom was to go down the aisles every day and see if the maid had turned down any seats. But as manager of the theater in charge of the physical condition of the seats, it cannot be said that those were the only duties owing by him as to their safe condition. His custom in that regard was apparently his own plan, and prescribed by himself as manager in charge of the condition of the seats. He cannot set up for himself a custom as the standard by which his duty is measured, and then contend that a diligent discharge of it was all he owed to the public. His recital of the custom of inspection used by him was evidently meant to rebut the evidence that the seat was defective, as plaintiff contended. It was for the jury to say whether he discharged his duty in the matter of the physical conditions of the seats." See also Galveston, H. & S. A. Ry. Co. v. Contois, Tex.Civ.App., 279 S.W. 929.

We think that there was substantial proof tending to show negligence in the action of Smith in letting loose or letting down the weight which he had theretofore been carrying without any warning to the appellee. The court acted correctly in refusing the affirmative charge requested by the appellant. Bailey, Admr'x v. Central Vermont Railway, Inc., 319 U.S. 350, 63 S.Ct. 1062, 87 L.Ed. 1444; Ellis v. Union Pacific Railroad Co., 329 U.S. 649, 67 S. Ct. 598, 91 L.Ed. 572.

■ Assignment No. 10. There was no error in refusing to give charge 4. It was fairly and fully covered in the oral charge of the court to the jury. Aplin v. Dean, 231 Ala. 320, 164 So. 737; Duke v. Williams, 249 Ala. 574, 32 So.2d 362.

Assignment No. 13. There was no error in refusing to give charge 9. It is sufficient to say that the substance of charge 9 was fairly and fully covered by the oral charge.

Assignment No. 15. There was no error in refusing to give charge 16. It is sufficient to say that the substance of charge 16 was fairly and fully covered by the oral charge.

■ Assignment No. 16. There was no error in refusing to give charge 18. This charge ignores certain tendencies of the evidence and places an undue emphasis on one phase of the evidence. Nelson v. Lee, 249 Ala. 549, 32 So.2d 22; Bradley v. Powers, 214 Ala. 122, 106 So. 799.

Assignments 1 and 2. It is insisted that the court was in error in refusing to set aside the verdict and judgment thereon because contrary to the great preponderance of the evidence. We have considered the evidence with great care and cannot agree

with this insistence. Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916.

Finding no error the judgment of the lower court is affirmed.

Affirmed.

FOSTER, LIVINGSTON and LAWSON, JJ., concur.