75 So.2d 91

**ATLANTIC COAST LINE RAILROAD CO.**

v.

**William W. BARNES.**

**6 Div. 406.**

Supreme Court of Alabama.

Oct. 7, 1954.

Graham, Bibb, Wingo & Foster, Birmingham, for appellant.

498

. Jackson, Rives, Pettus & Peterson, Birmingham, for appellee.

PER CURIAM.

This is an appeal by the Atlantic Coast Line Railroad Company from a judgment awarding damages to appellee for personal injuries.

Appellee was the conductor on a freight train of appellant running from Elyton, Alabama, to Manchester, Georgia. It was therefore engaged in interstate commerce, and appellee as an employee of appellant was injured in the course of that employment and growing out of it. His claim for damages is therefore controlled by the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. The train consisted of sixty-two cars and the caboose and was drawn by two diesel engines. The injury occurred while the train was passing through a rough mountainous section of Alabama, having immediately passed out of Shelby County. It was passing through an area in which the trainmen had orders to move slowly and watch out for rocks on the track. The train left Elyton about four o'clock in the afternoon on March 16, 1949. After it left Bessemer, appellee, Barnes, and the flagman, Pouncey, were riding in the cupola of the caboose. Pouncey was engaged in writing reports. Barnes was at his place in the cupola looking out of the window. There was a platform with benches on either side upon which to sit in the cupola. In sitting there the two men were engaged in the performance of service for the appellant. The weather was cold and it was getting dark. Barnes testified that he got down and "got an old rag and opened the stove door and stirred up the fire, * * * and went to the rear and took down one marker and brought it inside to light, and set it down on the floor, wiped off the lens with a rag * * *; got a match and prepared to stoop over in a braced position and prepared to light the marker * * * when there was a sudden and unusual hard jerk, which jerked me back * * * in that stooped over position against the corner of the door; hit at the lower part of my spine,". and before he could brace or grab anything, the caboose "swerved" almost as if it had hit a rock wall, and he went forward hitting on his knee and hand on the floor. There was in the caboose a "pot bellied" stove with a "top eye". This "top eye" was jarred off the top of the stove. It was made of cast iron and was about twelve inches in diameter and weighed about seven pounds. It was said to be "counter sunk place" before it was jarred off.

Appellee testified that he first became qualified as a railroad freight conductor in about 1923, and had about two years "switching". He was then asked, upon the basis of his experience of about eleven years and knowledge of the conditions then and there existing, whether the jerk on that occasion was an unusual one,—to which objection was overruled and exception reserved, and he said that it was "an unusual jerk", and with the same objection overruled and exception reserved as to each separately; answered it was "an ex-

traordinary jerk"; that "it was not necessary" in his opinion: that the cause of such a jerk was "what we call an excessive slack action". He explained "running in of slack as when the cars take up all the play or slack in the drawhead, as when going downgrade". When it all gets in, that is "bunch slack". "Running out of slack" is the opposite of "running in". The entire train was equipped with air-brakes operated by the engineer. In the opinion of appellee, in the light of his experience, the engineer could control the extent of the slack action in that train; and in his opinion the improper use of the air-brakes, the improper use of the throttle or improper use of both combined cause the excessive slack action on that occasion. He also testified "there could have been some defects in the air-brake system on the train", such as were called "bad triples or leaking train lines", that could have caused it. That is a part of the braking system. "A break in the air line throws the entire train into emergency". No such defect was shown to exist.

He further testified that he suffered pain from the "lick". He lit and hung up the markers, but was suffering pain and got "fainty and nauseated": his kidneys and bowels wanted to act and he had severe pain in the lower part of his spine. He then crawled up on the left side of the cupola and began vomiting out of the window. He frequently went back to relieve his bladder—his kidneys were giving him much pain, and that he stayed in the cab until they reached Lineville where they took on a colored man as a "dead head" with a permit. He was a brakeman for the Louisville and Nashville Railroad Company and helped the flagman. Appellee was lying in the cupola of the cab and was suffering much pain when they stopped at LaGrange, Georgia, where they had about twelve cars to deliver to another railroad, and switching was to be done in which as conductor he should participate, so he got the "dead head" to do it. The train went on to Manchester. The accident reports were there made out and signed by Barnes, the engineer, fireman and brakeman, and then he went home. They verified Barnes' statement in the reports. On the next day he went to the hospital at Waycross upon the advice of the company doctor. At the hospital he was treated by other company doctors. He was confined there from March 18th until April 4th or 5th. They made x-rays and administered internal medicine and injections in the spine,—during all of which time he suffered much pain. After leaving the hospital he went back to Manchester and was under the care of the company doctor there, Dr. Johnson. There was a fracture of the coccyx, which was massaged and treated, and which was very painful. He had a vacation coming up and taking advantage of it he was off until April 24th. Around April 18th he had bid in a job as baggage master or flagman on a passenger train, but had sufficient seniority to go back on his freight job, to which he did not go because he claimed the lower part of his spine was passing blood and he was suffering pain; and although he went to work on the passenger train he was not physically able to do the job. The doctors testified that Barnes had a fracture of the coccyx, the extreme end of the spinal column. Dr. Johnson testified that he treated Barnes from April 5th to April 17th, 1949, when, in his opinion, he was feeling well enough to go back to work. He was x-rayed again in November 1950 and in June 1951, and the fracture was so completely healed that there was no evidence of it whatever on the x-ray pictures. He did not have sufficient seniority to get on the conductors' board in freight service. He had served as a conductor only in emergency, but had been working regularly as a freight flagman. By the exercise of his seniority, he bid for and obtained the job of baggage master or flagman in the passenger service between Manchester and Birmingham because the work was not so hard. He lost time from that work because he was having trouble with the lower part of his spine, from September 6, 1949 to October 23, 1949, and from October 15, 1950 to November 29, 1950, in addition to the time from March 17, 1949 to April 18, 1949. All together, he testified, he lost $1,653.34 on that account, and that there was less pay for a passenger baggage mas-

ter than a freight flagman by $50 to $60 a month. He proved that his expectancy was approximately nineteen years and that the present value of a monthly income of $50 for nineteen years at two and one-half percent is $9,000; at four percent is $8,000; and at five and one-half percent is $7,000.

There was evidence that in 1948, before the accident, appellee had "psychoneurosis anxiety state"; and that he had that trouble after the accident. There was a difference of opinion among the doctors as to whether the accident had anything to do with that neurotic condition. He told a doctor that just worry and responsibility for the trains caused him to want to change his work. One of the doctors testified that on June 20, 1951, he had a long talk with appellee who said he was happy in his work as flagman (baggage master), and that he was emotionally upset as long as he was a conductor. That doctor also testified that his injury had nothing to do with that condition.

There was conflict in the evidence as to whether there was a sudden, severe, unusual and unnecessary jerk. Probably there was more evidence that there was no such jerk than that there was.

The four major contentions of appellant are:

1. The refusal of the affirmative charge.

2. The verdict was contrary to the great weight of the evidence and, therefore, the motion for a new trial should have been granted.

3. Error in allowing the defendant to testify that the jerk was unusual and unnecessarily severe.

4. The amount of the damages awarded as reduced by the judge was greatly excessive.

It is claimed, first, that the affirmative charge should have been given because negligence is not proven on the part of defendant or any of its employees in respect to plaintiff's injury.

■ Of course, negligence as alleged must be proven, "and not left to mere conjecture or speculation, and it must appear that such negligence was a proximate cause, in whole or in part, of the accident", Atlanta B. & C. R. Co. v. Cary, 250 Ala. 675, 35 So.2d 559, 560; Reynolds v. Atlantic Coast Line R. Co., 251 Ala. 27, 36 So.2d 102, a mere scintilla is not sufficient. Louisville & N. R. Co. v. Steel, 257 Ala. 474, 59 So.2d 664.

■■ There is no presumption of negligence which defendant has any duty to refute. If the evidence does not show that negligence was a proximate contributing cause of the accident, plaintiff cannot recover. Alabama Great Southern R. Co. v. Davis, 246 Ala. 64, 18 So.2d 737, 740. An engineer "should exercise due care to avoid injurious consequences to an employee who in the discharge of his duties is likely on that account to be in a dangerous place". Alabama Great Southern R. Co. v. Davis, supra; Mobile & O. R. Co. v. Williams, 219 Ala. 238, 121 So. 722; Id. 221 Ala. 402, 129 So. 60; Id. 224 Ala. 125, 139 So. 337; Id. 226 Ala. 541, 147 So. 819.

■ We have had two sudden jerk cases: Southern Ry. Co. v. Dickson, 211 Ala. 481, 100 So. 665, and Southern Ry. Co. v. Smith, 221 Ala. 273, 128 So. 228. They establish the principle that for the jerk to be actionable, it must be sudden, extraordinary, of unusual violence and not necessary, caused by the engineer in the operation of the train, who knew or should have known that plaintiff in the performance of his duties would probably be imperiled by it. The engineer, fireman and brakeman on the engine sixty-two car lengths away, testified that they did not feel the effect of such a jerk: likewise the flagman in the cupola. But there was undoubtedly a sudden severe jerk, and a sudden stoppage, which caused appellee to fall and together produced a fracture of his coccyx bone and other minor injuries; and caused the seven pound eye in the top of the stove to be thrown out.

Appellee had had long experience serving on freight trains, and evidently was familiar with the ordinary effect of the slack

running in and out. His testimony is clear and positive that it was a sudden, unusual and unnecessary jerk. Emphasis is made by appellant upon the testimony of appellee that such a jerk could have resulted from some defect in the air system. But no defect was shown, and the train continued to its destination. To so find would be mere speculation.

The jury could also infer that a sudden, unusual and unnecessary jerk on such a long heavy train might imperil an employee riding in the caboose where his services were to be performed at the time. Southern Ry. Co. v. Smith, supra.

■ It is our view that the affirmative charge was not due to be given for defendant, and that a finding for plaintiff was not contrary to the great weight of the evidence.

■ It was held in the "jerk" cases, Southern Ry. Co. v. Dickson, supra, and Southern Ry. Co. v. Smith, supra, that a witness having had a long period of service, qualifying him as an expert, could testify that the jerk was caused by the slack going in and the giving of too much steam to it, which slack in the drawheads caused a jerk, and that it was unnecessary and not an ordinary incidental jerk. There was therefore no error in allowing defendant to give that evidence.

It is insisted here, as in the trial court on motion for a new trial, that the amount of the award is so greatly excessive as to shock the conscience. Veitch v. Southern Ry. Co., 220 Ala. 436, 126 So. 845.

There was evidence that the actual loss appellee sustained which was directly attributable to his injury, was $1,653.34. He chose a job which carried less compensation, and presumably was not as burdensome. He had a psychoneurotic condition. Two doctors in the service of appellant testified that it was due to hard work and mental exhaustion, such as he had in 1948, that this accident did not cause such condition and had nothing to do with it and that the injury was completely healed. An-other doctor, a psychiatrist, examined appellee shortly before the trial, without knowing of his neurotic condition in 1948, and testified that appellee was subject to "psychoneurotic anxiety state", and, based on what appellee told him, that this "anxiety state" might have been related to the accident described to him by appellee. "The anxiety and fear that he had associated with his job became increasingly more severe; and to use his terms, his nerves broke down; and he just had to quit". Appellee continued to work as baggage master or flagman on the passenger train up to the time of the trial. This neurotic condition due to such cause is said not to be unusual.

The trial judge in charging the jury left it to them to find whether the earning capacity of appellee had been permanently decreased as a proximate result of the accident, and if so to what extent and its probable duration as for the life expectancy of appellee, and to ascertain from the proof the present value of any such decrease resulting from the injury. And the amount so ascertained could be considered by them in fixing the amount of plaintiff's recovery, if they find for plaintiff. All of that was of course a correct interpretation of the applicable rule. Louisville & N. R. Co. v. Steel, supra. They were also instructed to consider the physical pain and suffering of plaintiff in fixing the amount of the damages recoverable.

■ The jury found for plaintiff and fixed the damages at $20,000. The trial court on motion for a new trial required plaintiff to remit $4,000, thus reducing the amount to $16,000. This he did. Appellant complains that the reduction was not sufficient, and that this Court should further reduce it if there is no other reversible error. The case of Waters v. Anthony, 252 Ala. 244, 40 So.2d 316, has some similarity. See, also, Waters v. Anthony, 256 Ala. 370, 54 So.2d 589.

The judgment of the trial court should be affirmed.

The foregoing opinion was prepared by Foster, Supernumerary Justice of this Court, while serving on it at the request

of the Chief Justice under authority of Title 13, section 32, Code, and was adopted by the Court as its opinion.

Affirmed.

LIVINGSTON, C. J., and SIMPSON, GOODWYN and CLAYTON, JJ., concur.